

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,054

**RODNEY REED, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM
### CAUSE NUMBER 8701 IN THE 21ST DISTRICT COURT
### BASTROP COUNTY

KEASLER, J., delivered the opinion of the Court in which KELLER, P.J., and HERVEY, ALCALA, RICHARDSON, YEARY, KEEL, and WALKER, JJ., joined. NEWELL, J., not participating.

## OPINION

Rodney Reed sought post-conviction DNA testing of over forty items collected in the course of investigating Stacey Stites's sexual assault and murder. This investigation culminated in Reed's conviction and sentence of death for the capital murder of Stites. The trial judge denied the motion. Because Reed cannot establish that exculpatory DNA results would have resulted in his acquittal and his motion is not made for the purpose of unreasonable delay, we affirm the trial judge's denial.

## I. Background

### A.    Trial

Because we detailed the case's factual background elsewhere,[1] only the facts relevant to Reed's current DNA appeal are included in this opinion. Stacey Lee Stites's partially clothed body was found on the side of a back country road in Bastrop County on April 23, 1996. She was wearing only a black bra, underwear, undone blue jeans, socks, and a single tennis shoe, and her H.E.B. name tag was found in the crook of her knee. A white t-shirt, a piece of a brown woven belt without a buckle, and two beer cans were found nearby. Before Stites's murder, she was engaged to Jimmy Fennell, a Giddings police officer at the time, and the two shared Fennell's red pick-up truck. Stites worked the early-morning shift at H.E.B. and typically drove the truck to work. The truck was discovered in the Bastrop High School parking lot after Stites's disappearance. Among other things inside the truck, authorities found Stites's other shoe and broken pieces of a green plastic cup. Outside the truck, police found a piece of a brown woven belt with the buckle attached.

Department of Public Safety (DPS) crime scene investigators Karen Blakley, Wilson Young, and Terry Sandifer processed Stites's body, the truck, and the scene where Stites was found. Blakley testified at trial that the murder weapon was the belt "[b]ecause it matched the pattern that was on [Stites's] neck." Blakley also concluded that the two belt pieces matched and were torn, not cut. Because Stites was found partially clothed and with her

---

[1]    *See Ex parte Reed*, 271 S.W.3d 698, 702–12 (Tex. Crim. App. 2008).

pants ripped open, Blakley presumed a sexual assault preceded the murder. At the scene, Blakley further observed Stites's underwear was wet in the crotch and bunched around her hips, so she tested the crotch of the underwear for semen. Getting a positive result, Blakley collected DNA samples from Stites's vagina and breasts. Blakley did not collect samples from Stites's rectum because rigor mortis had already set in. Blakley also observed scratches on Stites's arms and abdomen, a cigarette burn on her arm, and what appeared to be fire ant bites on her wrists. To preserve any DNA evidence under her fingernails, DPS investigators put plastic bags over Stites's hands.

Dr. Robert Bayardo, the Travis County Medical Examiner, conducted Stites's autopsy the day after her body was found. He determined that Stites died around 3:00 a.m. on April 23rd. He also concluded that the belt was the murder weapon and that Stites died of asphyxiation by strangulation. Like Blakley, Bayardo presumed Stites was sexually assaulted, took vaginal swabs, and found sperm with both heads and tails intact. He also took rectal swabs but found only sperm heads with no tails. He noted that her anus was dilated with superficial lacerations. Dr. Bayardo thought the presence of sperm in the anus was indicative of penile penetration, but noted that it may have been attributed to seepage from the vagina. He concluded that Stites's anal injuries occurred at or around the time of death and therefore were not acts of consensual sexual activity.

When Young and Sandifer processed the truck for evidence, neither found fingerprints, blood, or semen identifying the perpetrator. However, they and Ranger L.T.

Wardlow, the lead investigator on the case, noted the driver's seat position was reclined with the seatbelt fastened as if someone was pulled out of the seat while buckled in. Young, who stood six feet, two inches, also noticed that when he sat in the reclined driver's seat, he had a clear view out of the back window in the rearview mirror. Based on this, they concluded that someone who was six-foot-two or of similar height must have driven the truck.

Five days after Stites's body was found, a citizen reported finding some items they believed were connected to Stites's murder. The report, written by Officer Scoggins, stated that the citizen reported that a part of a shirt, two condoms, and part of a knife handle were found. At trial, Ranger Wardlow testified that he did not have personal knowledge about who brought in the condoms. However, he testified that he saw the condoms a short while after they were brought in and confirmed that the condoms "appeared to be old and cracked and worn out." These items were not tested for DNA evidence before trial.

Police investigated Stites's murder over the course of eleven months. During that time, police obtained twenty-eight biological samples from twenty-eight males. None of them matched the biological evidence found in and on Stites's body. After following several theories and lines of investigation—ruling out people Stites knew personally—police learned information about Reed that could make him a suspect. Reed was about the same height as Young, lived near the Bastrop High School, and frequently walked the area late at night. Police learned from DPS that Reed had an existing DNA sample on file and had DPS test it against the vaginal swabs taken by Blakley. Two different DNA tests of the samples

concluded that Reed could not be excluded as a donor of the semen. Looking for more conclusive results, DPS forwarded the samples to LabCorp for additional testing. Again, the results could not exclude Reed and determined that the samples matched Reed's genetic profile. The LabCorp technician, as well as Blakley, testified that intact sperm did not live more than twenty-four hours after commission of a vaginal-sexual assault and sperm breaks down faster in the rectal area than in the vaginal vault.

The jury found Reed guilty of capital murder and assessed a sentence of death.

**B.      Post-Conviction Procedural History**

This case has an extensive post-conviction litigation history. After trial, Reed filed a direct appeal alleging insufficient evidence supporting his capital murder conviction which we denied based on the strength of the evidence presented at trial.[2] Our judgment relied on Reed's DNA found in and on Stites's body, expert testimony regarding how long sperm heads can survive in the vagina and anus, and expert testimony that the sexual assault occurred at or near the time of death.

Before this Court affirmed the conviction, Reed filed an initial application for writ of habeas corpus under Code of Criminal Procedure Article 11.071. Reed also filed a supplemental claim while the initial writ was pending. We denied his initial application and

---

[2] *Reed v. State*, No. AP-73,135 (Tex. Crim. App. Dec. 6, 2000) (not designated for publication).

characterized the supplemental claim as a subsequent application and dismissed it.[3] Reed

filed a federal habeas application which was stayed and held in abeyance until Reed

exhausted all available state remedies.[4] Then in March 2005, Reed filed another subsequent

application that this Court ultimately denied in part and dismissed in part.[5] Between 2007

and 2009, Reed filed three more subsequent applications that were dismissed as abusive for

failing to satisfy Article 11.071, § 5.[6]

In August 2009, the federal court lifted the stay on Reed's federal writ application.

In 2012, the federal district court judge denied Reed's application.[7] Reed then filed motions

to alter and amend the court's judgment and for leave to amend his petition and abate the

proceeding. He asked "the district court to reopen his case, vacate its prior judgment, grant

him leave to add an additional due process claim, and abate all further proceedings until he

exhausted the due process claim in state court."[8] The judge denied the motions. And in

January 2014, the Fifth Circuit denied a certificate of appealability, essentially affirming the

---

[3] *Ex parte Reed*, Nos. WR-50,961-01 & WR-50,961-02 (Tex. Crim. App. Feb. 13, 2002) (not designated for publication).

[4] *Reed v. Stephens*, 739 F.3d 753, 763 (5th Cir. 2014).

[5] *Ex parte Reed*, 271 S.W.3d at 751.

[6] *Ex parte Reed*, Nos. WR-50,961-04 & WR-50,961-05 (Tex. Crim. App. Jan. 14, 2009) (not designated for publication); *Ex parte Reed*, No. 50-961-06 (Tex. Crim. App. July 1, 2009) (not designated for publication).

[7] *Reed*, 739 F.3d at 763.

[8] *Id.*

denial.[9]

## C.     Reed's Request for Post-Conviction DNA Testing

In April 2014, the State requested an execution date be set.  At a hearing held in July 2014, the trial judge set the execution date for January 14, 2015.  On the day of the hearing, Reed filed his Chapter 64 motion requesting DNA testing of a large number of items.  In reviewing Reed's pleadings, we note that Reed has not clearly or consistently identified items he seeks to test.  At times, items discussed in the body of a pleading are not reflected on an appended chart purporting to be a comprehensive itemized list of the extent of Reed's motion.  Consistent with the State's objections at the live evidentiary hearing, we note that some items Reed evidently seeks to test were not specifically listed in Reed's Chapter 64 motion or addendum, yet were discussed by Reed's expert witnesses at the hearing.

To group the items, we look to Reed's addendum to his latest proposed findings of fact and conclusions of law and follow, but do not adopt, Reed's categories dividing the items he seeks to have tested: (1) items recovered from Stites's body or her clothing, (2) items found in or near Fennell's truck, and (3) items found near the victim-recovery scene. Because the live hearing testimony covered additional items that do not neatly fall within Reed's categories, we add an "other" category.  Out of an abundance of caution and because the trial judge entered findings and conclusions regarding all the pleaded and unpleaded items in denying DNA testing, we include them in this appeal.

---

[9]  *Id*. at 790.

**1.      Items recovered from Stites's body or her clothing:**

- Pants
- Underwear
- Bra
- H.E.B. name tag
- White t-shirt
- Section of belt (no buckle)
- Section of belt (with buckle)
- Earring
- Right shoe
- Left shoe
- H.E.B. employee shirt
- Strands of hair from left sock, back of left leg, and back
- White flakes
- Tape lifts from pubic area
- Vaginal and rectal swabs

The State and Reed agreed to have the last three items listed tested outside of Chapter 64's parameters, and the judge entered an agreed order to that effect July 14, 2014.  The record shows Reed abandoned his Chapter 64 testing request in regard to these items.

**2.      In or near Fennell's truck:**

- H.E.B pen
- Knife and metal cover
- Metal box cutter
- Pack of Big Red gum
- Piece of green plastic cup
- Brown planner/organizer
- Single hair from planner/organizer
- White paper napkin
- Carbon copies of checks
- Gas emergency book
- Latent fingerprint from passenger door
- Automatic teller receipt
- Bridal shop receipt
- Walmart receipt

- Business card
- Plastic bag
- Blue nylon rope
- Brown rope

**3. Victim-recovery scene:**

- Plastic bags placed over Stites's hands during investigation
- Used condoms
- Two Busch beer cans
- Swabs/samples taken from mouths of two Busch beer cans
- Extract samples from blue condom stored in coin envelope
- Piece of shirt
- Piece of knife

**4. Other:**

- Knee brace
- Back brace
- Green blanket
- White paper used under Stites's body during autopsy

**B. Live Hearing Testimony**

Reed's Chapter 64 motion largely hinges on the newly available analysis of touch DNA. Touch DNA is based on Locard's Principle that when a person touches something the person's epithelial, or skin, cells transfer to that object and then may be subjected to DNA analysis. But Reed also argued that items previously and successfully analyzed for DNA should be retested and subjected to more advanced and sensitive DNA analyses.

John Paolucci, a former detective and crime scene expert specializing in DNA cases, testified that scratches found on Stites's back and the back of her hand suggested that she was dragged. Paolucci expected that the person who dragged Stites would most likely

deposit skin cells on the part of Stites's body or clothing the perpetrator grabbed to pull her body. Because the belt had a similar pattern to the markings found on Stites's throat and was most likely used to strangle Stites with pressure, Paolucci opined there would likely be a significant deposit of the perpetrator's skin cells on it. As to the items found in Fennell's truck, and presumably the items found outside, Paolucci acknowledged he would presume that Fennell's DNA will be deposited on certain areas. Paolucci also noted that DNA testing would confirm or contradict accounts given by an alternate suspect. The commingling of a large number of the items Reed seeks to have tested in a box together would not, in Paolucci's opinion, make that evidence unsuitable for testing. In his opinion, even though the items are contaminated, Paolucci stated that if DNA profiles from contaminated and not contaminated items match, "you can start putting together evidence of an alternate suspect."

Deanna Lankord, an associate laboratory director at Cellmark Forensics, similarly testified that she would look for touch DNA, in addition to performing a more traditional DNA analysis of previously tested biological evidence using newer, more advanced techniques. She testified that, in her experience, she has tested pieces of evidence that have been commingled in a single container. And in her experience, her laboratory has "had many cases where [it] . . . obtained probative results" even when evidence is stored in this manner. Based on the exchange principle, Lankford opined that all of the specified items contain some amount of DNA material. Without testing the items, however, she could not say for sure or give an opinion on the likelihood of discovering DNA to the extent of producing a

DNA profile, or a person's identity based on testing deposited DNA.

Lankford conceded that there could be infinite possibilities of DNA combinations on the items stored in the box of evidence maintained by the Bastrop Clerk's Office because many people may have touched the items. Lankford acknowledged compounded possibilities because, under the exchange principle, those handling the items could deposit others' DNA. Despite a conceivably infinite mix of DNA combinations, Lankford testified that properly handled and stored evidence could act as a control of sorts. She explained it thus:

> [I]f we were to obtain DNA—DNA information from an item from the box and it happened to match an item that we tested from a different location stored in, say, a more appropriate manner, we can compare the two and see if—I mean, if they match, then there's a different scenario there.
>
> * * *
>
> Well, that it wouldn't be a contaminant from someone handling the evidence, say a jury member or something.

Lankford testified similarly while addressing the potential of DNA being transferred from one item to another. She again focused on redundancy.

> If you think of an assailant handling certain areas of clothing or shoes or socks and you obtain DNA from those areas and they match and you test other areas of clothing maybe where an assailant wouldn't necessarily be grabbing or touching someone so they don't match those other areas, then you can kind of put two and two together.

Yet in a mixed sample when a major and minor contributor could not be identified, Lankford noted that there would be no way to separate the particular alleles discovered in subsequent testing and associate them to a particular profile without reference samples from the different

parties who potentially touched the items. And without these reference samples, the DNA test results would remain inconclusive.

The State presented testimony from three witnesses: Sergeant Gerald Clough, an Office of the Attorney General investigator; Etta Wiley, a Bastop County Deputy Clerk; and Lisa Tanner, the lead trial prosecutor at Reed's trial. According to his testimony, Clough investigated the existence of certain items introduced in Reed's trial and included in Reed's Chapter 64 motion. He discovered a number of items in two unsealed boxes maintained by the Bastrop County Clerk's office. The record contains the photos Clough took depicting how the items were stored. With the exception of one bagged item, the photos show that the evidence was simply placed in the box and was not separated into individual bags. Stites's clothing, a planner, both pieces of the belt, and videotapes, among other pieces of evidence, are clearly visible. The items are distinctly commingled and touching one another.

Bastrop County Deputy Clerk Etta Wiley testified that she is responsible for the exhibit closet for criminal matters. Wiley created an inventory list at the State's behest and testified about a number of paper trial exhibits maintained in a single manilla envelope at the clerk's office; specifically, the bridal shop receipt, a photographer's receipt, Reed's acknowledgment of statutory warnings, carbon copies of Fennell's checks, a utilities receipt, and Walmart receipts. Wiley testified that each trial exhibit was not individually wrapped and was commingled with the others in the manilla envelope. According to Wiley, the exhibits were maintained under lock and key, and the evidence was not substituted, replaced,

tampered with, or materially altered while in her care.

Lisa Tanner, the lead prosecutor at Reed's trial, testified that, after the forensic testing was completed before trial, a number of people handled the evidence at trial without gloves. Not only did she not use gloves at trial, but neither did the defense attorneys, court personnel, the court reporter, and presumably the district clerk. The list potentially included the twelve jurors. The admitted evidence was sent back with the jury to deliberate, and Tanner testified that she did not know if gloves were available for the jurors. According to Tanner, the evidence was not separately packaged when it was available to the jury.

After holding a live evidentiary hearing, the trial judge denied Reed's DNA testing request and issued findings of fact and conclusions of law. This direct appeal followed.[10] After remand, the judge made supplemental findings of fact and conclusions of law.

## II. Analysis

### A. Chapter 64's Requirements

When Reed filed his motion for Chapter 64 DNA testing, Texas Code of Criminal Procedure Article 64.01 stated that "[a] convicted person may submit to the convicting court a motion for forensic DNA testing of evidence containing biological material."[11] At that time, to be eligible for post-conviction DNA testing of certain evidence, the evidence must have been secured in relation to the charged offense and been in the State's possession during

---

[10] *See* TEX. CODE CRIM. PROC. art. 64.05 (West Supp. 2016) (providing appeals to this Court when a person is sentenced to death).

[11] TEX. CODE CRIM. PROC. art. 64.01(a-1) (West Supp. 2014).

the trial, "but: (1) was not previously subjected to DNA testing; or (2) although previously subjected to DNA testing, can be subjected to testing with newer techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test."[12]

Then-existing Article 64.03 provided that a court may order DNA testing under Chapter 64 only if it finds that:

(1) the evidence still exists and is in a condition making DNA testing possible;

(2) the evidence has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

(3) identity was or is an issue in the case;

(4) the convicted person establishes by a preponderance of the evidence that the person would not have been convicted if exculpatory results has been obtained through DNA testing; and

(5) the convicted person established by a preponderance of the evidence that the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.[13]

Effective September 1, 2015, the Legislature amended Articles 64.01(a-1) and 64.03.[14]

Article 64.01(a-1) now provides that a convicted person may seek forensic DNA testing of evidence "that has a reasonable likelihood of containing biological material."[15] The

---

[12]  *Id.* art. 64.01(b).

[13]  *Id.* art. 64.03.

[14]  Acts 2015, 84th Leg., ch. 70 (S.B. 487), § 1 (effective Sept. 1, 2015).

[15]  TEX. CODE CRIM. PROC. art. 64.01(a-1) (West Supp. 2016).

amendment also added a requirement to Article 64.03: the judge must find, in addition to the above requirements, that "there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing."[16]

## B.      Standard of Review

When reviewing a judge's ruling on a Chapter 64 motion, we use the familiar bifurcated standard of review articulated in *Guzman v. State*: we give almost total deference to the judge's resolution of historical fact issues supported by the record and applications-of-law-to-fact issues turning on witness credibility and demeanor.[17]  But we review *de novo* all other application-of-law-to-fact questions.[18]

## C.      Findings of Fact and Conclusions of Law

There is no dispute that the items Reed seeks to have tested exist and are in a condition making DNA testing possible and that identity was or is an issue in this case.  The judge accordingly concluded that these requirements were satisfied.[19]  Further, the record and the parties' briefing also indicate that there is no dispute whether Reed satisfied Article 64.01(b)'s requirement that the items were either not tested for DNA or could be tested with

---

[16]  *Id.* art. 64.03(a)(1)(B).

[17]  *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002) (referring to *Guzman v. State*, 955 S.W.2d 85,89 (Tex. Crim. App. 1997)); *Holberg v. State*, 425 S.W.3d 282, 284–85 (Tex. Crim. App. 2014).

[18]  *Id.*

[19]  *See* TEX. CODE CRIM. PROC. art. 64.03(a)(1)(A)(i), (1)(C).

newer technologies providing more accurate and probative results. However, the parties took differing positions on the balance of Article 64.03's requirements. We review the judge's remaining findings and conclusions in turn.

**1. Is the evidence subject to chain of custody sufficient to establish that individual pieces of evidence have not been substituted, tampered with, replaced, or altered in any material respect?**

The judge concluded that a significant number of the items do not satisfy this standard. The judge concluded that the following items connected to Stites's body or clothing have been contaminated, tampered with, or altered:

- Pants
- Underwear
- Socks
- Left shoe
- Right shoe
- Bra
- White t-shirt
- Section of belt (no buckle)
- Section of belt (with buckle)
- Earring
- H.E.B. employee shirt
- H.E.B. name tag

The judge concluded the following items recovered from or near Fennell's truck were contaminated, tampered with, or altered:

- Knife and metal cover
- Pieces of plastic cup
- Brown planner
- Bridal shop receipt
- Portrait receipt
- Carbon copies of checks
- Walmart receipt

Lastly, the judge's findings extended to the following items in the "other" category:

- Back brace
- Knee brace

Reed's argument for testing these items under Chapter 64 is the advancement in touch DNA, a relatively new DNA technique that can develop a DNA profile from epithelial cells left by those handling the item. The judge based his conclusion on the evidence presented at the evidentiary hearing and, as a result, focused on the testimony pertaining to the number of people who handled (or potentially handled) the items depositing DNA on them and the likelihood that deposited DNA itself could be transferred to other items. The judge found credible Tanner's testimony that the above items were handled by ungloved attorneys, court personnel, and possibly the jurors. The judge also found credible Clough's and Wiley's testimony establishing that the evidence was not separately packaged, but instead commingled in a common repository. The judge credited Paolucci's testimony on cross-examination that there is "a good chance that [the items in the clerk's boxes are] contaminated evidence." The judge also credited Lankford's response to the State's hypothetical that handling evidence without gloves would tamper with the evidence. According to the judge, both assertions by Reed's witnesses were not contradicted.

We find the record supports the judge's findings and the conclusion on this requirement. The requirement at issue here necessitates a finding that the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted,

tampered with, replaced, or altered in any material respect."[20] Clough's and Wiley's combined testimony established that the items the judge deemed contaminated, tampered with, or altered were trial exhibits maintained by the Bastrop County Clerk's Office and not individually packaged. And based on Tanner's credited testimony, many people handled those exhibits without gloves. Reed's own witnesses conceded that the manner of the trial exhibits' handling contaminated or tampered with the evidence. The cumulative weight of the State's and Reed's witnesses demonstrates that the manner in which the evidence was handled and stored casts doubt on the evidence's integrity, especially for the specific testing Reed seeks. Reed's experts' testimony on a suggested approach to mitigate the effect of the evidence's alterations does not undermine the judge's determination that certain items did not satisfy Article 64.03(a)(1)(ii).

The judge concluded that the remaining items that were not similarly handled and stored have been subject to a chain of custody sufficient to establish that they have not been substituted, tampered with, replaced, or altered in any material respect.

### 2. Does the evidence contain biological material suitable for DNA testing?

The judge found that there was not a reasonable likelihood that any of the items Reed sought tested listed above (and that were not withdrawn from his motion at the hearing) contain biological material suitable for DNA testing. This conclusion focused on the limitations of Paolucci's and Lankford's testimony about certain items.

---

[20] *Id*. art. 64.03(a)(1)(A)(ii).

The judge excluded all paper items under this criterion because Paolucci testified that, in his experience, he "didn't have much success in testing paper as a substrate." The judge further found that Paolucci necessarily did not know whether the white paper napkin, green blanket, driver's seat tape lift, and white paper sheet placed under Stites contained biological material because he testified that he would want to examine those items to determine whether they contained biological material. On the likelihood that touch DNA was present on the items, the judge found that Paolucci could not "say for sure where—where these items were touched." And specifically, the judge found that Paolucci admitted that he could not say that the perpetrator touched the white paper napkin, H.E.B. pen, knife with metal cover, or the brown planner. The judge further found that Paolucci did not testify whether biological material might be found on any of the paper items, the latent fingerprint, plastic bag, blue rope, brown rope, pubic tape lift, piece of shirt, piece of knife, extracts from condom, and extracts from beer cans. The judge also found that Paolucci could not "'promise anybody that there's going to be DNA' on any particular item."

The judge likewise found limitations on Lankford's certainty whether any specific item was handled. The judge found that Lankford testified similarly to Paolucci, in that she would examine the green blanket, white paper sheet, and the driver's seat tape lift for trace evidence; an implicit opinion that she did not know whether those items in fact contain biological material. As with Paolucci's testimony, the judge found that Lankford did not discuss whether biological material would be found on certain items, specifically: any of the

paper items; the earring; plastic bag; blue rope; brown rope; piece of shirt; piece of knife; extracts from condoms; extracts from beer cans; back brace; and knee brace. Regarding the presence of touch-DNA, the judge found that Lankford "admitted that she did not know whether any particular item was handled or that there is biological material in the supposedly handled item." Nor could Lankford "'say for sure' that DNA will be detected on the items for which [Reed] requests testing."

After our own independent review of the hearing testimony, we find many of the judge's findings unsupported by the record and therefore we will not afford near total deference. Many of the judge's findings improperly tie together the separate inquires of whether the items are reasonably likely to contain biological material suitable for DNA testing with whether testing would produce a DNA profile. The statutory criterion is concerned only with the former. Both Paolucci's and Lankford's testimony centered on the exchange principle that maintains skin cells and DNA deposits remain on an item every time it is touched. Both witnesses testified to the ubiquity of touch DNA and both testified that, based on the exchange principle, they were one-hundred percent certain that certain items contained biological material. During Paolucci's testimony, the judge clearly understood the concept in this exchange on cross-examination:

> [State]: But you can tell with 100 percent certainty that there's DNA on this material? Yes or no? Yes — yes or no?
>
> [Paolucci]: It's such a —
>
> [Paolucci]: That would be misleading to answer that yes or no, Judge.

THE COURT: Well, not really because there's going to be DNA on everything.

[Paolucci]: There is DNA on everything.

THE COURT: It may or may not have anything to do with this case, but there's DNA. That's basically what you're saying then?

[Paolucci]: Yes, I mean it's so —

THE COURT: Okay—

[Paolucci]: —minuscule that, you know, we might not have the—we might not have the ability, the sensitivity of testing at this point but, you know, is there [sic] DNA present.

In her affidavit, Lankford expressed her opinion that, based on the exchange principle and to a reasonable degree of scientific certainty, the following items (not waived at the hearing) contain biological material: the two pieces of the belt, pants, white t-shirt, condom, H.E.B. name tag, latent fingerprint found on Fennell's truck, white paper napkin, H.E.B. pen, and carbon copies of checks. Lankford conceded, however, that only through testing could one determine whether a DNA profile could be obtained. At the hearing she expanded the list of items she believed contained biological material to include underwear, socks, shoes, bra, earring, H.E.B. shirt, knife with the metal cover, the pieces of the plastic cup, planner, cigarette lighter, beer cans, package of gum, and metal box cutter. Paolucci's opinions were consistent with Lankford's. The State did not impeach Paolucci's and Lankford's applications of Locard's Principle supporting their opinions. Nor did the judge enter any adverse credibility finding on their testimony.

We note, like the judge did in his findings and conclusions, that the "reasonable likelihood" statutory standard became effective after Reed filed his Chapter 64 motion. When Reed filed his motion, Article 64.01(a-1) permitted a convicted person to request "DNA testing of evidence containing biological material."[21] We held that "[a] literal reading of [that] statute unequivocally mandates that all evidence to be tested must first be proven to contain biological material."[22] We further held that movants bear the burden to "*prove* biological material exists and not that it is merely probable."[23] Current Articles 64.01(a-1)'s and 64.03(a)1)(B)'s new language requiring merely a reasonable likelihood that the evidence contains biological material is decidedly less onerous. Nonetheless, the judge found that Reed could not satisfy either standard when he included in his findings that his conclusion on this criterion would stand applying either the 2013 or 2015 versions of Chapter 64.

Because the record does not fully support the judge's finding on whether Reed satisfied his burden on the presence of biological material, we cannot adopt the finding in its entirety. We do, however, find record support for the judge's finding that Reed's witnesses did not address whether a number of items are reasonably likely to contain biological material. Therefore, Reed failed to satisfy his burden as to those items. After reviewing the witnesses' testimony on what they did and did not conclude contained biological material,

---

[21] TEX. CODE CRIM. PROC. art. 64.01(a-1) (West Supp. 2014).

[22] *Swearingen v. State*, 424 S.W.3d 32, 37 (Tex. Crim. App. 2014) (quoting *Swearingen v. State*, 303 S.W.3d 728, 732 (Tex. Crim. App. 2010)).

[23] *Id*. at 38 (emphasis in original); *Holberg*, 425 S.W.3d at 285.

we find that Reed proved that either biological material exists or there is a reasonable likelihood that it exists on the following items:

- Both pieces of the belt
- Pants
- White t-shirt
- Condoms
- H.E.B. name tag
- Fingerprint found on Fennell's truck
- White paper napkin
- H.E.B. pen
- Carbon copies of checks
- Underwear
- Socks
- Right and left shoes
- Bra
- Earring
- H.E.B. shirt
- Knife with the metal cover
- Pieces of the plastic cup
- Planner
- Cigarette lighter
- Beer cans
- Package of gum
- Metal box cutter

**3.    Has Reed established by a preponderance of the evidence that he would not have been convicted if exculpatory results were obtained through DNA testing?**

Addressing all of the items Reed moved to have tested, the judge concluded that Reed failed to prove by a preponderance of the evidence that he would not have been convicted in light of exculpatory results from DNA testing of all the evidence he requested to be tested. The judge found that "[t]he State's case on guilt-innocence was strong." The judge found that the evidence at trial demonstrated Reed's "presence" and that the sexual assault occurred

contemporaneously with the murder. The judge highlighted two additional aspects of the evidence: Reed frequented the area of Stites's disappearance and Reed matched the height of someone who would have fit the adjusted seat in the truck Stites was driving the night of her disappearance. Because many of the items Reed seeks to have tested were already before the jury and the jury knew they did not match Reed, the judge found that the items' potential exculpatory nature was already known to the jury. Further, the judge found that "none of the evidence was so integral to the State's case that the jury would have acquitted despite knowing that [Reed's] DNA was not on the item." In concluding that Reed failed to meet his burden, the judge found that the evidence's handling undermines its exculpatory value and "would muddy the waters, not prove by a preponderance that he would have been acquitted."

Before addressing the judge's findings on this criterion, we pause to summarize what evidence remains after our conclusions on the previous criteria thus far. Doing so marshals the evidence we must analyze to determine whether Reed has carried his burden that he would not have been convicted if exculpatory results were obtained through DNA testing. When we remove the items that are contaminated, tampered with, or altered in a material way from the items that we conclude contain biological evidence, we are left with the following items:

- Condoms
- Fingerprint found on Fennell's truck
- White paper napkin
- H.E.B. pen

- Cigarette lighter
- Beer cans
- Package of gum
- Metal box cutter

In his brief, Reed asserts that the judge erred in concluding that he did not satisfy his burden in this respect because the judge misapplied the law in two critical ways. First, the judge incorrectly weighed the strength of the State's case at trial and assumed the correctness of the State's theory at trial. Reed claims the judge failed to consider subsequent evidence submitted with his motion that disproves the State's timing theory. Second, citing this Court's opinion in *Routier v. State*,[24] Reed argues that the judge improperly narrowed the definition of "exculpatory result" by failing to presume results implicating an alternative known suspect and the possibility of finding the same third party DNA on separate items. Reed argues that he satisfied his burden that the jury would not have convicted him had the judge applied the correct legal standard and the jury was informed that Reed's DNA was not present on these items. The judge further erred, Reed asserts, by not considering the effect on the conviction had the jury been informed that a redundant DNA profile of a third party was found on other items that were handled by Stites's killer or particular items already tested.

To be entitled to Chapter 64 DNA testing of these items, Reed must show by a preponderance of the evidence—a greater than 50% likelihood—that he would not have been

---

[24] 273 S.W.3d 241, 259–60 (Tex. Crim. App. 2008).

convicted if the proposed testing's exculpatory results were available at the time of his trial.[25]

"For purposes of this inquiry we must assume (without deciding, of course) that the results of all of the post-conviction DNA testing to which [Reed] is entitled under Article 64.01(b) would prove favorable to him."[26] "Exculpatory results" means only results excluding the convicted person as the donor of this material.[27] Reed's brief on this point claims post-trial factual developments undermine the State's theory at trial, but our review in this context does not consider post-trial factual developments. Instead, we limit our review to whether exculpatory results "would alter the landscape if added to the mix of evidence that was available at the time of trial."[28]

We conclude that Reed fails to prove by a preponderance of the evidence that, in light of presumed exculpatory DNA results, he would not have been convicted. Both in the trial court and on appeal, Reed fails to articulate why the presumed exculpatory results of the items he wanted tested would result in the jury finding him not guilty, as opposed to merely "muddying the waters" as the trial judge concluded.[29] Assuming that the exculpatory results include finding the same DNA profile on the condoms, beer cans, fingerprint found on

---

[25] TEX. CODE CRIM. PROC. art. 64.03(a)(2)(A) (West Supp. 2014); *Holberg*, 425 S.W.3d at 286–87.

[26] *Routier*, 273 S.W.3d at 257.

[27] *Holberg*, 425 S.W.3d at 287.

[28] *Id.* at 285; *see Kutzner v. State*, 75 S.W.3d 427, 439 (Tex. Crim. App. 2002).

[29] *See Ex parte Gutierrez*, 337 S.W.3d 883, 901 (Tex. Crim. App. 2011).

Fennell's truck, white paper napkin, H.E.B. pen, cigarette lighter, package of gum, and metal box cutter, Reed cannot establish that an exculpatory redundant profile would have, by a preponderance of the evidence, resulted in his acquittal. Our holding that Reed cannot meet his burden by aggregating the exculpatory results naturally includes a holding that Reed's showing fails as to each singular item.

First, Reed cannot establish that the condoms, beer cans, and the white paper napkin are connected to Stites's capital murder. According to the trial testimony, the two beer cans were collected by the latent-fingerprint examiner who found them located across the road from where Stites was discovered. Another member of the crime-scene examination team testified that finding beer cans on the side of a country road is not uncommon. Other than an effort to be thorough in collecting items relatively near the crime scene, there was nothing in particular that led law enforcement to believe that the beer cans were connected to the crime scene.

There was sparse trial testimony concerning the circumstances of the condoms' recovery. Ranger Wardlow testified that condoms were given to the sheriff's office, although he did not recall exactly who turned them in. The trial record makes no mention where the condoms were discovered and by whom. Even assuming they were discovered near where Stites's body was found, Ranger Wardlow testified that the condoms appeared to be old, cracked, and worn out, suggesting they had long predated Stites's death. Reed's own expert at the Chapter 64 hearing testified similarly concerning the condoms' condition.

Although the trial testimony indicates that the white paper napkin was collected from the ground near Fennell's truck parked at the high school, there is no testimony to suggest that the napkin came from Fennell's truck. While the statute requires that we presume exculpatory results of the putative testing, it does not require us to presume an item's relevance to the question of the offender's identity. Reed provides little more than supposition to suggest that, because it was found on the ground outside of Fennell's truck, the napkin was connected to the murder. It is an ever bigger stretch to say that testing the napkin may identify Stites's murderer. The napkin was mentioned only twice over the course of the thirteen-volume record on guilt-innocence, and then merely in a list of items collected. Like the beer cans and condoms, Reed cannot demonstrate the relevance of the napkin, much less that its testing and the attending exculpatory result injects sufficient doubt into the evidentiary mix that a jury would acquit.

The items collected from Fennell's truck are only incrementally more likely to be connected to Stites's murder solely by virtue of the State's theory at trial that Reed assaulted Stites in the truck, dumped her body in the woods, and parked the truck in the high school parking lot. Yet Reed fails to demonstrate that the alternative murderer would have necessarily left the fingerprint found on Fennell's truck and handled the H.E.B. pen, cigarette lighter, package of gum, and metal box cutter. Other than their proximity to the murder's commission, the record fails to establish why these items are relevant to establishing Stites's murderer. Reed's experts recommended that these items be tested simply because a

perpetrator could have touched them. We fail to see how even a presumed redundant profile on these items would have raised doubt sufficient enough to cause the jury to acquit Reed.

Second, Reed's counsel suggested his trial was "a case of competing stories," but he fails to explain why exculpatory results makes his story at trial clearly more convincing than the State's "story." At trial, Reed raised a two-pronged defensive theory: First, Reed pointed to the possibility that another person, particularly Fennell or David Lawhon, committed the murder. Second, Reed had a secret romantic relationship with Stites and his semen was present as a result of consensual intercourse.

The State's theory at trial was that Reed's DNA profile found in the semen deposited in Stites's vagina and rectum and in the saliva on her breast clearly indicated that Reed had sex with Stites. And based on the injuries she suffered both pre- and post-mortem, the State argued that the sexual encounter was not consensual. Dr. Bayardo, the medical examiner, estimated that Stites died at 3:00 a.m., give or take a few hours. Because he observed fully intact sperm taken from the vaginal swabs, Dr. Bayardo concluded that the sperm was deposited "quite recently." Crime-scene investigator Karen Blakely testified that, based on a published study, sperm will remain intact inside the vaginal tract for as long as twenty-six hours. The medical examiner also found several sperm heads without visible tails from the rectal swabs and testified that sperm breaks down much faster in the rectum than it does in the vagina. During the sexual-assault exam, Dr. Bayardo noticed that Stites's anus was dilated and superficially lacerated. Dr. Bayardo concluded that the anal injury occurred at

or near the time of her death. From the witnesses' testimony, the State argued to the jury that "whoever raped Stacey [Stites] also killed her."

The presumed redundant exculpatory results do nothing to undermine the State's case or alter the evidentiary landscape at Reed's trial. The results do not affect the State's time line supporting its theory tying the murder to the rape, the argument the jury ultimately believed. The presumed redundant DNA profile exculpatory results also do not support Reed's consensual-relationship defense that the jury disregarded. It is on this latter point, among others, that Reed's case differs from that in *Ex parte Routier*, a case he argues the trial judge misapplied.

In *Ex parte Routier*, we examined each piece of evidence to determine whether each piece individually satisfied Chapter 64's requirements and, as a result, limited the items subjected to testing to a facial hair, a pubic hair, blood on a tube sock, a night shirt, and a blood sample on the door to the garage. We then set out to determine whether Routier could prove that she would not have been convicted had the jury known of the presumptively favorable test results.[30] At trial, Routier denied stabbing her two sons. She contended that "[s]he awoke to discover a stranger departing through the kitchen and utility room and out through the garage, leaving a bloody butcher knife from the kitchen behind on the utility room floor."[31] "The State presented circumstantial evidence suggesting that there was no

---

[30] *Routier*, 273 S.W.3d at 256–59.

[31] *Id*. at 244.

intruder, that the crime scene had been 'staged,' that [Routier] had inflicted the wounds on herself, and that she had some pecuniary motive to murder her children."[32] Assuming a redundant DNA profile from a single unknown contributor on these items, we held that such results substantially corroborated Routier's account by placing an unknown assailant at the scene who then fled the house through the garage.[33] We held this corroboration "would have a strong tendency to engender a reasonable doubt in an average juror's mind" and Routier was entitled to post-DNA testing.[34]

The circumstances surrounding the items subjected to post-conviction testing in *Routier* differ from those Reed seeks to test. The items Routier wanted tested were those that corroborated her defensive theory at trial. Second, and relatedly, those items, together with the presumptive redundant DNA profile, were significant because they were associated with the crime scene through Routier's own trial testimony and were recovered (with the exception of the tube sock) in her house, a place where only a reasonably limited number of hair and blood DNA contributors would be found. The same cannot be said of the remaining items in this case potentially subject to testing.

The presumptively exculpatory results in this case are decidedly weaker than in *Routier*. The presumptive redundant DNA profile does not sufficiently alter the evidentiary

---

[32] *Id.* at 244–45.

[33] *Id.* at 257–58.

[34] *Id.* at 258, 259–60.

mix to a degree that would have a strong tendency to engender a reasonable doubt in an average juror's mind. The exculpatory results, even allowing a presumption that the redundant profile would be Fennell's, do not corroborate Reed's defensive theory that a consensual relationship existed between Stites and Reed nor do they strengthen the argument that Fennell murdered Stites. Again, even allowing an overly expansive presumption that the exculpatory results would come back to Fennell, the jury would most likely not be surprised to learn that Fennell's profile was found on his own truck or on items found in his truck. And if we presume Fennell's DNA profile was found on the extracts taken from the condoms and beer cans, in light of their uncertain provenance or connection to the crime scene, we cannot say the jury would have found sufficient doubt that it would have acquitted Reed.

Moreover, any presumptive exculpatory results, including evidence of a redundant DNA profile, are relatively weak evidence because of the specific biological material Reed seeks to test. Reed's experts definitely opined that all of the items Reed identified have biological material because epithelial cells are ubiquitous on handled materials. According to the hearing testimony, testing technology has advanced to the degree that a small number of skin cells may yield a DNA profile. But as Reed's DNA experts explained the exchange principle, there is an uncertain connection between the DNA profile identified from the epithelial cells and the person who deposited them. Just as a person may deposit his own epithelial cells, he may deposit another's if those cells were exchanged to him by touching an item another has touched. So the exchange principle may support an equally persuasive

argument that the DNA profile discovered from an epithelial cell was not deposited by the same person associated with the particular DNA profile.[35]  And as with all DNA testing generally, touch DNA analysis cannot determine when an epithelial cell was deposited.  So in addition to being unable to definitively show who left the epithelial cell, it is unable to show when it was deposited.  Reed's experts contradict his argument that touch DNA would prove the perpetrator's identity.

4. **Has Reed established by a preponderance of the evidence that his request for DNA testing is not made to unreasonably delay the execution of his sentence or administration of justice?**

The judge concluded that Reed failed to meet his burden on delay.  In support of his conclusion, the judge found, among other things:  (1) Reed failed to provide time estimates for the DNA testing he seeks; (2) Reed's filing his Chapter 64 motion on the day the State sought an execution date was a tactic designed to delay setting an execution date; (3) Reed had earlier opportunities to request Chapter 64 testing throughout his state and federal post-conviction litigation; (4)  Reed initiated informal DNA-testing requests with the State only after the Fifth Circuit affirmed the district court's denial of his petition for habeas corpus, leaving little chance for future relief; (5) Reed has a history of filing untimely requests for testing in federal court, and this request is a continuation of this behavior; (6) Reed's claim that his request was delayed because he did not know of some evidence's existence until

---

[35]  *Cf. Swearingen*, 424 S.W.3d at 38–39 (holding that discovering another's DNA under the victim's fingernails would not factually exclude Swearingen in light of the many ways another's DNA could have ended up there).

reading the State's response is not credible; and (7) Reed waited more than four months to obtain a subpoena for his own reference sample for purposes of testing certain items the State and Reed agreed to test outside of Chapter 64.

Although Article 64.03(a)(2)(B) does not contain set criteria a court must consider in deciding whether a movant satisfied his burden that his request is not made to unreasonably delay a sentence's execution, various opinions flesh out the inquiry by considering the circumstances surrounding the request. Those circumstances may include the promptness of the request, the temporal proximity between the request and the sentence's execution, or the ability to request the testing earlier.[36] However, individual cases in this area turn on the discrete facts they presented and they offer no definitive criteria for answering this inherently fact-specific and subjective inquiry.

We hold that Reed failed to establish that his request is not made to unreasonably delay the execution of his sentence or the administration of justice. Reed's untimely request to test a significant number of items, including some items the State has agreed to test and others whose relevance to the crime are unknown, supports the conclusion that this motion was intended to delay his impending execution date. As chronicled earlier in this opinion, Reed engaged and continues to engage in protracted litigation since his conviction was

---

[36] *See, e.g.*, *Swearingen*, 303 S.W.3d at 736 (noting that movant could have requesting testing of materials earlier); *Thacker v. State*, 177 S.W.3d 926, 927 (Tex. Crim. App. 2005) (movant failed to satisfy his burden when he waited over fours years to file his motion less than a month before his execution); *State v. Patrick*, 86 S.W.3d 592, 598 (Tex. Crim. App. 2002) (Hervey, J., concurring).

affirmed in 2000. In 2002, this Court denied Reed's initial application for habeas corpus.[37]

We dismissed as abusive under Texas Code of Criminal Procedure Article 11.071, § 5 the

other five applications Reed filed over the next seven years.[38] In our 2009 opinion

dismissing Reed's third and fourth subsequent applications, we noted that Reed has taken a

"piecemeal approach" in his post-conviction litigation.[39] Reed also sought habeas relief in

the federal courts, but his claims were denied in 2012. Before the denial was affirmed on

appeal in 2014, he sought post-judgment remedies to further delay final judgment by

requesting leave to add additional claims and abatement to restart his state court habeas

litigation.[40]

While seeking an agreement with the State to voluntarily submit items for DNA

testing without litigation is laudable and generally should not be held against a movant, the

record reveals that Reed initiated the negotiations only after the 5th Circuit Court of Appeals

denied his request for a certificate of appealability approximately three days before. Reed

claims that the State dragged out the negotiations for months. The record does not indicate

---

[37] *Ex parte Reed*, No. WR-50,961-01 (Tex. Crim. App. Feb. 13, 2002) (not designated for publication).

[38] *Ex parte Reed*, No. WR-50,961-02 (Tex. Crim. App. Feb. 13, 2002) (not designated for publication); *Ex parte Reed*, 271 S.W.3d at 698; *Ex parte Reed*, Nos. WR-50,961-04 & WR-50,961-05 (Tex. Crim. App. Jan. 14, 2009) (not designated for publication); *Ex parte Reed*, No. WR-50,961-06 (Tex. Crim. App. Jul. 1, 2009) (not designated for publication).

[39] *Ex parte Reed*, Nos. WR-50,961-04 & WR-50,961-05, 2009 WL 97260, at *1.

[40] *Reed*, 739 F.3d at 763, 790.

one way or the other. But even if the expiration of five months is attributable to the State, it is *de minimus* in light of Reed's lengthy post-conviction litigation. After Reed secured the State's agreement to test certain evidence, he took four months to even start the process of submitting his own reference sample. The timing of Reed's motion is even more suspect when we consider that it was filed on the same day the judge heard the State's motion to set an execution date filed three months earlier.

Chapter 64 had existed with only slight variations for over thirteen years at the time Reed filed his motion,[41] and there does not appear to be any factual or legal impediments that prevented Reed from availing himself of post-conviction DNA testing earlier. Reed argues that he cannot be faulted for his inaction since Chapter 64's enactment. He reasons that he could not have sought the type of forensic DNA testing he does now until the Legislature amended Article 64.01(a) in 2011 defining "biological material" to include, in relevant part, skin cells, fingernail scrapings, and other identifiable biological evidence that may be suitable for DNA testing. We disagree with Reed's argument that "[before] the 2011 amendments, a movant could not move to test items handled by a perpetrator for 'touch' DNA unless prior testing or analysis had already established the presence of blood, semen, hair, saliva, skin tissues or cells, bone, or bodily fluid."[42] In our 2010 *Swearingen* opinion,

---

[41] Acts 2001, 77th Leg., ch. 2, § 2 (effective Apr. 5, 2001).

[42] Reed's Brief at 70.

we addressed a Chapter 64 request to perform touch DNA analyses.[43] The statutory impediment to Swearingen's claim was not necessarily the definition of "biological material" but rather the article's language requiring a movant to prove evidence contained biological material.[44] Swearingen failed to satisfy this requirement because he "made[] only a general claim that biological material could be found from touching" and "relie[d] on conclusory statements."[45] Unlike Reed, Swearingen failed to present expert testimony to support the conclusion that DNA would necessarily be deposited.[46] And unlike in *Swearingen*, we have previously found that Reed presented sufficient expert testimony to establish certain evidence contained biological material. We therefore find no legally unavailable claim or legal impediment preventing Reed from seeking Chapter 64 testing at a much earlier time.

From the totality of circumstances surrounding Reed's motion, we hold that Reed is unable to establish by a preponderance of the evidence that his motion was not made for purposes of delay.

## III. Conclusion

Because Reed failed to show by a preponderance of the evidence a reasonable probability that exculpatory DNA test results would change the outcome of his trial and that

---

[43] *Swearingen*, 303 S.W.3d at 732–33.

[44] *See id*. at 732.

[45] *Id*.

[46] *Id*.

his request was not made to unreasonably delay the execution of his sentence or the administration of justice, we conclude that the trial judge did not err in denying Reed's Chapter 64 motion.

DELIVERED: April 12, 2017

PUBLISH