

# NUMBER 13-22-00159-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

DEMESTRA ROSS,                                                    Appellant,

v.

THE STATE OF TEXAS,                                               Appellee.

## On appeal from the 85th District Court of Brazos County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Justice Benavides**

Demestra Ross, proceeding pro se, appeals from the denial of his motion for post-conviction DNA testing. *See* TEX. CODE CRIM. PROC. ANN. art. 64.01 ("Chapter 64"). By what we construe as a single issue with multiple sub-parts, Ross contends that the trial

court erred in denying his motion because he satisfied Chapter 64's requirements.[1] We affirm.

## I.  BACKGROUND

### A.  The Crimes

According to a probable cause affidavit, on March 3, 2008, a person entered a Shell gas station, brandished a "small silver gun," and demanded money from the clerk. The clerk said that the assailant was a black male; approximately 5′9″ to 5′11″ tall; weighed between 180 and 200 pounds; and "was wearing a ski mask, a baby blue ball cap, a long[-]sleeve sweater[,] and a pair of gloves." The police reviewed a surveillance video of the incident and observed the assailant flee with "the cash register."

Three days later, a person entered a liquor store, brandished a "black handled, chrome derringer," and demanded money from the two clerks. One of the clerks said the assailant was a black male; 6′1″ to 6′3″ tall; weighed between 180 and 200 pounds; and "was wearing a blue baseball cap, amber colored oval shaped glasses, black leather jacket (knee length), sweater pulled over his face, blue fabric gloves, blue jeans, and blue and white athletic shoes." The assailant left the scene with "five First National Bank bags" containing cash and coins.

### B.  The Investigation

Approximately two weeks later, local police officers were preparing to execute a search warrant at the residence of Leola Maxey on unrelated robberies when Maxey and

---

[1] This appeal was transferred to us from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer).

Ross arrived at the residence in a red Jeep driven by Maxey. The police later determined that Maxey had rented the Jeep while her vehicle was being serviced and that Ross was living with Maxey at her residence.

During the search of the residence, police found First National Bank bags with receipts from the liquor store, a black coat resembling the one worn by the assailant during the liquor store robbery, and a box of blue gloves. A search of the Jeep yielded a chrome derringer with a black handle, amber colored glasses, a blue baseball cap, and other items of clothing, which, according to police, resembled clothing worn by the assailant during the robberies.

Police noted that Ross, a black male, 5′11″ tall, and weighing 195 pounds, generally fit the description provided by the clerks at both stores. After initially refusing to cooperate, Maxey later led police to an illegal dumping site where they recovered the cash register from the gas station. She acknowledged that she owned the chrome derringer but said that Ross occasionally borrowed it.

## C.     The Trial

Ross was indicted on three counts of aggravated robbery, but the State only proceeded on two counts at trial. The various items discovered during the searches, as well as the cash register, were admitted into evidence. Among other witnesses, Maxey testified on behalf of the State.[2]

An expert for the State found a partial palm print on the cash register but determined that the print was not suitable for comparison. A defense expert disagreed;

---

[2] We note that although the trial court took judicial notice of the reporter's record from the trial, we have only been provided with small portions of the trial record. Leola Maxey's testimony was not included.

3

he testified that the partial palm print was sufficient for comparison and did not match Ross's palm prints.

During closing arguments, Ross's trial counsel questioned Maxey's credibility, saying "she's embezzled money from a bank, and she's robbed a bank at gunpoint." In his opinion, the evidence indicated that Maxey was at least an accomplice to the robberies, and he suggested that the perpetrator may have been one of several other males that spent the night at her residence.

He also criticized the thoroughness of the police investigation. In particular, he pointed out that the State failed to test any of the other evidence for prints. He also acknowledged that he and the prosecutors had handled some of this evidence without gloves.

> And you know what's interesting is we have no physical, scientific, forensic evidence ever presented by the Government in this entire trial. None of these receipts were printed, checks, lottery tickets, bags, gun. There [are] prints on here right now, probably from me and [the prosecutors]. And remember [Maxey] said that [Ross] was the one that put the gun in the car. We would have been able to know that for sure if they would have taken the time to print it. But the first time you ever saw any forensic evidence was from the defense. And no forensic evidence was taken in this case until last Friday, 16 months after these crimes were alleged to have been committed.

The jury found Ross guilty on both counts of aggravated robbery, and after pleading "true" to an enhancement paragraph, Ross was sentenced to concurrent sixty-year terms of confinement. He filed a direct appeal, which was denied by our sister court. *See Ross v. State*, No. 10-09-00249-CR, 2010 WL 4572693, at *6 (Tex. App.—Waco Nov. 10, 2010, pet. ref'd) (mem. op., not designated for publication).

4

**D.      The Motion for Post-Conviction DNA Testing**

In 2021, Ross requested the appointment of counsel to represent him in a Chapter 64 proceeding. *See* TEX. CODE CRIM. PROC. ANN. art. 64.01(c) ("A convicted person is entitled to counsel during a proceeding under this chapter. The convicting court shall appoint counsel for the convicted person if the person informs the court that the person wishes to submit a motion under this chapter, the court finds reasonable grounds for a motion to be filed, and the court determines that the person is indigent."). In a supporting affidavit, Ross suggested that if the gun, cash register, receipts, and coins were "tested for his DNA, it will show that such evidence was never touched by [him]." Instead, Ross believed the results "would show [the DNA of] another suspect"; namely, Maxey. According to Ross, this combination—the lack of his DNA and the presence of Maxey's DNA on the evidence—would disprove the State's theory of the case and demonstrate that he "had no role in such events."

The State opposed Ross's request for appointment of counsel, arguing that the evidence either no longer existed, was not in a condition making testing possible, or had not been subject to a proper chain of custody. *See id.* art. 64.03(a)(1)(A)(i), (ii). The State provided affidavits, photos, and portions of the trial transcript, which demonstrated the following: (1) there are no coins in the State's possession, and the court reporter's exhibit list does not refer to any coins being admitted as evidence; (2) the police found the cash register at an illegal dumpsite prone to flooding; (3) the gun, receipts, and other evidence were likely handled by several people without gloves leading up to and during the trial[3];

---

[3] In addition to the statement by Ross's trial counsel during closing arguments, the State provided an affidavit from prosecuting attorney Brian Baker, who said it was "possible" that he handled the evidence

5

(4) since the trial, some of the evidence had been comingled together in boxes, but most of the evidence, including the gun and receipts, were maintained in separate plastic bags or envelopes. The State also pointed out that witnesses at both robberies said the assailant was wearing gloves and that Ross's expert already testified at trial that he recovered a partial print from the cash register that did not belong to Ross.

Ross filed a response. He pointed out that though the prosecutor and his trial counsel were uncertain about how the evidence was handled, he distinctly remembered them wearing gloves during trial.

The trial court determined that Ross had failed to demonstrate reasonable grounds to conduct DNA testing on the evidence and denied his request for appointed counsel. *See id.* Ross then filed a pro se motion for post-conviction DNA testing based on the same grounds. *See id.* art. 64.03. The trial court denied the motion and issued findings of fact and conclusions of law, including the following:

13.     The Court finds that the District Clerk's Office does not possess any coins.

. . . .

16.     The reporter's record from the appeal of the jury trial in this case shows that the exhibits in question have been contaminated for purposes of DNA testing . . . .

17.     The Court also finds that [Ross] has not stated sufficient facts in his motion to support DNA testing of the fingerprint from the cash register drawer, where his own trial expert testified that the print did not belong to [Ross].

18.     The Court also finds that the exhibits in question have been

without gloves while preparing for trial and "probable" that he did so during trial. He agreed that Ross's trial counsel handled evidence without gloves during trial and said the jury and court reporter may have also handled the evidence without gloves.

contaminated for purposes of DNA testing, based on [the affidavit of Brian Baker and the storage of the evidence after trial].

19. The Court again finds that the manner in which the derringer gun, the fingerprint from the cash register drawer and receipts were handled and stored shows that those items have not been subjected to a chain of custody for purposes of DNA testing sufficient to establish that said evidence ha[s] not been substituted, tampered with, replaced, or altered in any material respect; said evidence is contaminated.

This appeal ensued.

## II.    STANDARD OF REVIEW & APPLICABLE LAW

We review a trial court's decision to deny a motion for post-conviction DNA testing under a bifurcated standard of review. *Reed v. State*, 541 S.W.3d 759, 768 (Tex. Crim. App. 2017); *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). Under this standard, we afford almost total deference to a trial court's determination of issues of historical fact and its application of the law to fact issues that turn on determinations of witness credibility and demeanor, but we review de novo the trial court's application of the law to fact issues that do not turn on determinations of witness credibility and demeanor. *Reed*, 541 S.W.3d at 768–69; *Holberg v. State*, 425 S.W.3d 282, 284–85 (Tex. Crim. App. 2014). Accordingly, when, as here, the trial court relies on the trial record, photos, and affidavits submitted by the parties, the trial court is in no better position than we are to make its decision, and we review the issues de novo. *See Smith v. State*, 165 S.W.3d 361, 363 (Tex. Crim. App. 2005). "If the trial court's decision is correct under any theory of law applicable to the case, we will sustain it." *Evans v. State*, 628 S.W.3d 358, 362–63 (Tex. App.—Fort Worth 2021, no pet.) (citing *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000)); *see also Scott v. State*, No. 14-08-01060-CR, 2010 WL

7

1236320, at *1 n.2 (Tex. App.—Houston [14th Dist.] Apr. 1, 2010, pet. ref'd) (mem. op., not designated for publication).

To be entitled to post-conviction DNA testing, a convicted person must satisfy the requirements of Chapter 64. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03. As a threshold matter, the convicted person must first establish that the evidence sought to be tested "still exists." *Id.* art. 64.03(a)(1)(A)(i). Next, he must demonstrate that the evidence "is in a condition making DNA testing possible." *Id.* Along similar lines, the trial court must also be satisfied that the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." *Id.* art. 64.03(a)(1)(A)(ii).

Once the fidelity of the evidence is established, the convicted person must then establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing. *Id.* art. 64.03(a)(2)(A). "This means that a convicted person must show a greater than 50% chance that he would not have been convicted if exculpatory results from the requested DNA testing had been available at trial." *Hall v. State*, 569 S.W.3d 646, 655 (Tex. Crim. App. 2019) (citing *Reed*, 541 S.W.3d at 774). Generally, an exculpatory result is one that excludes the convicted person as the donor of the DNA. *Id.* at 655–56 (citing *Reed*, 541 S.W.3d at 774).

"In considering the likelihood of conviction, we limit our review to whether exculpatory results would alter the landscape of evidence at trial, and we do not consider post-trial factual developments." *Id.* at 656 (citing *Reed*, 541 S.W.3d at 774). "The presence of another person's DNA at the crime scene will not, without more, constitute

8

affirmative evidence of appellant's innocence." *Bell v. State*, 90 S.W.3d 301, 306 (Tex. Crim. App. 2002).

### III.     ANALYSIS

Ross argues on appeal that he is entitled to post-conviction DNA testing because he satisfied all of Chapter 64's requirements. We conclude that Ross failed to carry his burden.

### A.     The Coins

Although witnesses from the liquor store told police that the bank bags contained coins, there is nothing in the record to suggest that the police recovered coins during their searches. Additionally, the court reporter's exhibit list does not show that coins were admitted as evidence at Ross's trial. In any event, the record conclusively establishes that the State does not possess any coins. Consequently, Ross failed to show that this evidence "still exists" for testing. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(1)(A)(i).

### B.     The Cash Register

Ross contends that touch DNA testing of the partial palm print recovered on the cash register would show that he did not touch the cash register. Setting aside the witness testimony that the assailant was wearing gloves, which we discuss below, Ross's expert testified at trial that the print did not belong to Ross. Although an exculpatory DNA testing result may have bolstered his expert's testimony, it certainly would not have "alter[ed] the landscape of evidence at trial." *See Hall*, 569 S.W.3d at 656 (citing *Reed*, 541 S.W.3d at 774). Essentially, the jury already considered similar exculpatory evidence when it convicted Ross. Accordingly, Ross failed to show by a preponderance of the evidence

9

that he would not have been convicted if further exculpatory results had been obtained through DNA testing. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A).

**C.      The Gun and Receipts**

Ross argues on appeal that the trial court drew the wrong conclusions from the facts because, even if the gun and receipts were "contaminated" with other DNA profiles, modern DNA testing can identify distinct DNA profiles from a mixed sample. In theory, we agree that known DNA samples from people who may have contaminated the evidence, such as Ross's trial counsel, the prosecutors, and the court reporter, could be used to eliminate them as donors. *See Skinner v. State*, No. AP-77,046, 2022 WL 5056917, at *10 n.15 (Tex. Crim. App. Oct. 5, 2022) (noting in a Chapter 64 appeal that "[d]ue to potential contamination of evidence, known DNA samples from people such as the court reporter (Larry Porton), Bundy, and Hester, who may have handled the evidence, were used to eliminate them as possible donors").

However, Ross never presented this science-based argument to the trial court. Instead, he only questioned the strength of the State's evidence on contamination and gave a different account of what occurred. In particular, Ross noted that neither his trial counsel nor the prosecutor was certain that they handled the evidence without gloves; instead, they stated only that this "probably" occurred. According to Ross, officials did wear gloves while handling evidence during trial.

Even if we gave equal weight to Ross's and the prosecutor's varying accounts of what happened more than ten years ago, the statement Ross's counsel made at the time of trial is compelling, and we cannot fault the trial court for crediting that statement over

Ross's recollection. *See Reed*, 541 S.W.3d at 770 (affirming the denial of a motion for post-conviction DNA testing where the trial court credited testimony that "many people handled [the] exhibits without gloves"). Thus, Ross failed to show that the gun and receipts were subjected to a chain of custody sufficient to establish that the evidence was not materially altered. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(1)(A)(ii).

Regardless, Ross's motion fails for another reason. Ross suggests that only Maxey's touch DNA would be present on the gun and receipts, but such a result would not have changed the trial's outcome. *See id.* art. 64.03(a)(2)(A). As Ross acknowledges in his motion, it was undisputed at trial that the assailant wore gloves at both robberies, so the lack of Ross's touch DNA on the gun and receipts would have been unremarkable, if not expected. *See Rivera*, 89 S.W.3d at 60 n.20 ("[T]he absence of appellant's DNA would not indicate innocence because it could simply mean none was deposited.").

Moreover, the presence of Maxey's touch DNA on the gun and receipts would only "muddy the waters." *LaRue v. State*, 518 S.W.3d 439, 446 (Tex. Crim. App. 2017) (quoting *Rivera*, 89 S.W.3d at 59). The witnesses all agreed that the assailant was male, not female. And Maxey acknowledged that the gun belonged to her; therefore, the probative value of her touch DNA on the gun would have been minimal. *See Hall*, 569 S.W.3d at 658 ("Touch DNA poses special problems because . . . 'touch DNA analysis cannot determine when an epithelial cell was deposited.'" (quoting *Reed*, 541 S.W.3d at 777)). Likewise, because the receipts were discovered at Maxey's residence, the presence of her DNA on the receipts could merely mean that she handled the receipts after the offense was committed. *See id.* Indeed, Ross's trial counsel suggested that Maxey was not a

11

credible witness because she was likely an accomplice to the robberies.

Finally, based on what we can gather from the limited record before us, there was a substantial amount of circumstantial evidence connecting Ross to the robberies. The police found numerous items in the residence and vehicle that were highly probative and affirmatively linked to Ross. Additionally, Ross generally matched the description provided by the witnesses, further linking him to the crime. Therefore, we also conclude that Ross failed to demonstrate by a preponderance of the evidence that he would not have been convicted if the gun and receipts had been tested for touch DNA. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A). Ross's issue is overruled.

## IV.    CONCLUSION

We affirm the trial court's order.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
16th day of December, 2022.

12