# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00420-CR

**In re Chance Deallen Keller**

**FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT**
**NO. 69920, HONORABLE FANCY H. JEZEK, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

In 2013, Chance Deallen Keller was convicted of capital murder for fatally shooting Steven Wright while committing or attempting to commit robbery. *See* Tex. Penal Code § 19.03(a)(2). Keller was sentenced to life imprisonment without the possibility of parole. *See id.* § 12.31(a)(2); *see also Keller v. State*, No. 03-13-00501-CR, 2014 WL 6617143 (Tex. App.—Austin Nov. 20, 2014, no pet.) (mem. op., not designated for publication) (affirming conviction). Five years later, Keller filed a motion for post-conviction DNA testing. *See* Tex. Code Crim. Proc. arts. 64.01-.05. The State opposed the motion. After reviewing the record and the parties' arguments, the district court denied the motion. In two issues on appeal, Keller asserts that the district court erred (1) by denying his request for DNA testing and (2) by denying his request for appointment of counsel. We will overrule both issues and affirm the district court's order denying Keller's request for DNA testing.

**BACKGROUND**

As set out above, Keller was charged with and ultimately convicted of capital murder. Following his conviction, Keller filed a motion for new trial asserting that someone else was responsible for Wright's death, and the district court denied the motion. Following that determination, Keller filed a motion for DNA testing requesting that items collected during the investigation be tested or retested.

During the trial of the underlying criminal proceeding, evidence was presented demonstrating that Wright lived with his mother and stepfather in Belton and used and sold illegal drugs at their home. Because Wright sold drugs from his house, several individuals routinely went to Wright's home, including his friends Sarah Steglich and Brandon Hargett. On the night in question, Courtney White went to Wright's home to purchase drugs from Wright a few hours before Wright was killed. Keller also used and sold illegal drugs, and Keller and Wright knew each other. Keller admitted to law-enforcement personnel that he would "jack[] or rob[]" people he believed were drug dealers. Early in the morning on the day in question, Wright was shot in the abdomen in his home and died from injuries caused by a gunshot wound from a small-caliber bullet. Wright's stepfather found him deceased outside on the front steps to the porch of their house. The gun used in the offense was never recovered.

In the trial, evidence regarding Keller's commission of two prior offenses was also presented to the jury. The first prior offense was the robbery of Jesus Perez and Perez's girlfriend Aubry Waltrip one week before the murder of Wright. After agreeing to sell them drugs, Keller told them that he would supply them with extra drugs if Perez could "get [Keller] a throw-away gun."

2

Perez gave Keller a chrome-colored .22 handgun, and Keller asked Waltrip to accompany him to get the drugs while Perez stayed behind. Shortly after Keller and Waltrip walked off, Keller pointed the gun at her head and robbed her of the money that she was going to use to buy drugs.

The second prior offense was the attempted robbery of Margaret Biddy in Waco a few hours before the murder. Biddy met Keller through a mutual acquaintance, Megan Richardson. Keller went to Biddy's home shortly before Wright was killed and offered to sell her some cell phones and cameras. When Biddy indicated that she was not interested, Keller pulled out a handgun with a chrome-colored barrel, held the gun to Biddy's head, and demanded all the money in her purse. Biddy refused and ran after Keller with a bat when he started to leave. While chasing Keller, Biddy "heard a shot go off outside" before Keller left in a car. After the police responded to the scene, one of the investigating officers found a .22 shell casing in the location where Biddy said that someone fired a gun.

A few hours after Keller left Biddy's home, Keller asked his friend Richardson to drive him to Wright's house. On the way, Keller used Richardson's phone to make phone calls and send text messages to Wright. After they arrived, Keller went inside the residence and later returned to the car. Cell-phone records for Richardson's and Wright's phones showed that Richardson's phone made multiple calls to Wright's phone before Wright died, and Richardson's phone was the last one to contact Wright's phone before he died. The records also showed that Richardson's phone traveled from Waco to Belton and connected with a cell tower approximately one block from Wright's home.

While the police were investigating the murder at Wright's home, Wright's girlfriend and his friends Hargett and Steglich arrived. The police found a .22 shell casing at Wright's house.

3

Testing performed on the casing demonstrated that it was fired from the same gun as the casing collected from outside Biddy's home a few hours earlier.

Later on the same day that Wright was killed, Keller went to a hotel with Chrisann Cameron. While at the hotel, he called his sister, Lacy Fitch, for a ride because, as she testified, he and Cameron had gotten into a disagreement after Cameron stole his gun and some of his pills. Fitch and her friend Brittney Buckner picked up Keller and noticed that Keller was acting nervously. Keller asked them if they had heard anything about a murder. Fitch testified that Keller asked them to look up news stories about the murder of a man with Wright's first name, and Buckner testified that Keller asked them to look for any news about Wright.

Fitch later drove Keller to a store where Biddy's son recognized Keller and called the police. Keller left the store with Fitch and Buckner and drove away. After a pursuit, the police directed the driver, Fitch, to pull over. When the police initiated the stop, Keller made a statement to Fitch and Buckner before being ordered out of the car. Fitch testified that Keller asked her to tell their mom "he loved her" and stated that he was "going to jail" because he "shot him." Buckner testified that Keller asked them to "to tell his mom he loved her" and stated "that he would be going away for a long time" because "he killed . . . Wright" after unsuccessfully attempting to rob Wright.

After his arrest, Keller instructed Fitch and Buckner to take the memory card out of his phone and destroy it. They complied and flushed the card down the toilet. Keller told Fitch to tell Cameron to get rid of the gun that Cameron had taken.

When Keller was in jail, he told three jail guards that he had enemies in one part of the jail and that he could not return there "because of the person that I murdered" in Belton. While

4

in jail, Keller talked with several family members and friends. Those conversations were recorded and admitted during the trial. In one recording involving Cameron, Keller admitted to firing the gun while at Biddy's home, and Cameron stated that she took his gun. In another recording involving Fitch, Keller directed Fitch to tell Richardson to stop talking to the police and asked Fitch if she got rid of his phone. One additional recording was made of a conversation that Keller had with his sister Alexis Keller.[1] On that recording, Keller told Alexis to tell Richardson not to talk to the police, and Keller admitted that he made a "mistake." During an argument on the recording, Alexis stated that Keller "killed someone" while he was with Richardson to which Keller responded, "Exactly, and you won't talk to" Richardson to tell her not to talk to the police. Alexis also stated on the recording that Keller shot and killed someone.

During the investigation, law-enforcement officials collected or took samples from several items in Wright's bedroom or outside the home, and some items were subjected to forensic testing for trial, including vinyl siding from the porch, the front-door frame, front-door scrapings, a black shirt tied to a handrail outside Wright's home near his body, a blue shirt on Wright's bedroom floor found near the gun casing, and three cigarette butts found near Wright's body. DNA testing performed on the black shirt recovered from Wright's home was inconclusive. Testing performed on the blue shirt showed a mixture of three DNA profiles and revealed that Wright could not be excluded as one of the DNA contributors and that Keller could be excluded as a contributor.

When cross-examining several witnesses at trial, Keller asked whether Wright was friends with or associated with Steglich and Hargett and whether the police investigated if those

---

[1] Because Keller and his sister share identical surnames, we will refer to his sister by her first name.

5

individuals might have been involved in Wright's death. Keller cross-examined Waltrip about whether she had ever received a phone call from Hargett, and Waltrip explained that Hargett left her a voicemail stating that he knew who killed Wright. Keller questioned Detective Robert Prestin and Officer Tommaso Priori regarding how Steglich gave conflicting accounts of where she was during relevant times and concerning her involvement with and use of illegal drugs and how no attempt was made to examine Steglich's phone. Moreover, Keller called Steglich to the stand, who testified that Wright owed various people money, that Wright had a bad relationship with his stepfather, that Keller tried to rob her and Hargett after they bought drugs from him, and that Wright once accused her and Hargett of stealing from him.

The jury convicted Keller of Wright's murder. Following conviction, Keller filed a motion for new trial, and the district court convened a hearing. At the hearing on the motion for new trial, Leslie Whiteley testified that he met Hargett while he was in jail and that Hargett stated that he, Steglich, and Wright made a plan to rob Keller on the night in question. Whiteley testified that Wright called Keller to make a drug deal, that Keller drove to Wright's house, and that Hargett pulled a gun after Keller arrived. Whiteley recalled that Hargett said that he intended to shoot Keller but that Wright jumped in front of Keller. Moreover, letters that Whiteley wrote to various officials relating to his testimony were admitted and communicated that Keller "was taking the fall for the" death of Wright.

Additionally, Keller testified that he, Steglich, Hargett, and Adrian Morin were at Wright's house the day Wright died. Regarding the alleged offense, Keller testified that Hargett pulled out a gun, that Keller struggled with Hargett, and that Hargett started bleeding on a black shirt

6

and other places in the house due to injuries that he sustained during the struggle. Keller testified that the gun that Keller shot at Biddy's property fell out of his pocket during his struggle with Hargett, that Hargett grabbed that gun, that Hargett inadvertently shot Wright with the gun when Wright jumped in front of Keller, and that Hargett and Morin moved the body. Keller stated that Hargett disposed of the gun.

The district court denied the motion for new trial.

Several years later, Keller filed a motion asking for post-conviction DNA testing on several items that had been collected during the investigation of Wright's murder, including the black shirt, the blue shirt, three cigarette butts found outside Wright's home, the swab taken from the front door, the door frame, the piece of siding, and the scrapings from the front door.[2]

Keller attached several exhibits in support of his request, including police reports prepared as part of the investigation of Wright's murder as well as a search-warrant affidavit filed by one of the investigating officers. Besides those reports, Keller included Whiteley's letters originally submitted with Keller's motion for new trial in which Whiteley wrote that Hargett admitted to killing Wright. Similarly, Keller included a statement from Sebastianna Stanley. In her statement, Stanley wrote that her boyfriend Drake Zimniak told her that Hargett asked Drake "to keep a silver and black" .22 caliber handgun and that Zimniak believed that Hargett had killed Wright. Along those same lines, Keller included a letter from a prosecutor, Michael Waldman,

---

[2] In his motion for forensic testing, Keller requested that other items collected in the investigations of Wright's murder and of the robbery of Biddy be subjected to testing, but the district court denied those requests. On appeal, Keller does not challenge the district court's ruling regarding these additional items.

7

stating that an attorney had contacted him and said that the attorney's client, James Wright, related that Hargett had confessed to killing a man in Belton and "displayed a handgun to James Wright and advised that the handgun was the weapon he used to kill a man in Belton." Moreover, Keller attached a CODIS bulletin setting out that there were errors in the data used for DNA testing in criminal investigations over several years including the time period at issue in this case as well as a position statement from the Department of Public Safety regarding that bulletin.

In its response, the State urged the district court to deny the relief requested by Keller. Additionally, the State asserted that the black shirt found on the ground near Wright's body and the blue shirt found on Wright's bedroom floor were already subjected to DNA testing as part of the investigation, that there was no interpretable DNA discovered for the black shirt, and that the blue shirt had a mixture of DNA from three people, including Wright but not Keller. Further, the State related that the three cigarette butts found near Wright's body were never subjected to any testing but asserted that any results of testing performed on those items would not have exculpated Keller. Moreover, the State noted that after the district court denied Keller's motion for new trial, the State performed testing on the swab from the front door, the piece of the front-door frame, the piece of siding, and the scrapings from the front door. Regarding those items, the State related that presumptive testing for the presence of blood was negative.

After considering the arguments of the parties, the district court denied the request for DNA testing and issued the following relevant findings of fact and conclusions of law:

> 4. According to his DNA Motion, the defendant seeks to have DNA tested the following Items collected by the [Belton Police Department] and the [Waco Police Department]:

8

> Item 2 - black shirt;
> . . .
>
> Item 7 - cigarette butt;
> Item 8 - cigarette butt;
> Item 10 - cigarette butt;
> . . .
> Item 39 - dark blue shirt;
> Item 95 - front door swab;
> Item 96 - door frame;
> Item 97 - front porch siding; [and]
> Item 98 - front door scrapings[.]
> . . .

5. The defendant does not establish that there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing with regard to Items [2, 95, 96, 97, and 98].

. . .

7. The defendant does not establish . . . by a preponderance of the evidence that he would not have been convicted if exculpatory results are obtained through DNA testing of Items 7, 8, 10, . . . or the additional DNA testing of Item 39.

8. The Court finds no reasonable grounds for this Motion for Forensic DNA Testing to be filed. [H]ence, the defendant's Motion for Appointment of Counsel is denied.

After the district court made its ruling, Keller filed this appeal.

## GOVERNING LAW AND STANDARD OF REVIEW

Chapter 64 of the Code of Criminal Procedure governs post-conviction DNA testing. *See* Tex. Code Crim. Proc. arts. 64.01-.05. Chapter 64 "is simply a procedural vehicle for *obtaining evidence*" to be used in a later habeas proceeding, *In re Garcia*, 363 S.W.3d 819, 822 (Tex. App.—Austin 2012, no pet.) (emphasis added), "authorizes *DNA testing* in cases in which the applicant meets the requirements enumerated," *id.* at 821-22 (emphasis added) (citing Tex. Code

9

Crim. Proc. art. 64.03), and allows appellate courts to review a trial court's order denying DNA testing, Tex. Code Crim. Proc. art. 64.05. "However, chapter 64 is not an invitation to review every potential error in the underlying trial proceedings" and does not "confer jurisdiction on appellate courts to consider 'collateral attacks on the trial court's judgment or to review, under the guise of a DNA testing appeal, anything beyond the scope of those articles.'" *In re Garcia*, 363 S.W.3d at 822 (quoting *Reger v. State*, 222 S.W.3d 510, 513 (Tex. App.—Fort Worth 2007, pet. ref'd)); *see also Board of Pardons & Paroles ex rel. Keene v. Court of Appeals for Eighth Dist.*, 910 S.W.2d 481, 483 (Tex. Crim. App. 1995) (explaining that Texas Court of Criminal Appeals has complete jurisdiction over post-conviction relief from final felony convictions under article 11.07 of Code of Criminal Procedure); *In re Briscoe*, 230 S.W.3d 196, 196-97 (Tex. App.—Houston [14th Dist.] 2006, orig. proceeding) (per curiam) (stating that intermediate appellate courts have no jurisdiction over "post-conviction writs of habeas corpus in felony cases" under article 11.07).

A convicted person "may request forensic DNA testing *only* of evidence . . . that was secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense" but "was not previously subjected to DNA testing" or was previously subjected to testing but can now "be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." Tex. Code Crim. Proc. art. 64.01(b) (emphasis added). The Code of Criminal Procedure outlines the requirements that must be satisfied before DNA testing may be ordered. *Id.* art. 64.03. In particular, the court must find that "there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing" and that "identity was or is an issue in the case." *See id.* art. 64.03(a)(1).

10

"The identity requirement in Chapter 64 relates to the issue of identity as it pertains to the DNA evidence." *Prible v. State*, 245 S.W.3d 466, 470 (Tex. Crim. App. 2008). Accordingly, an incarcerated person "can make identity an issue by showing DNA tests would prove his innocence" regardless of "the strength of identification evidence at trial." *Cloud v. State*, Nos. 05-13-01235-CR, -01237-CR, 2014 WL 1413818, at *2 (Tex. App.—Dallas Mar. 26, 2014, pet. ref'd) (mem. op., not designated for publication). "However, if DNA testing would not determine the identity of the person who committed the offense or would not exculpate the person convicted, then the requirements for DNA testing under Chapter 64 are not met." *Sims v. State*, No. 03-14-00201-CR, 2014 WL 7475235, at *3 (Tex. App.—Austin Dec. 17, 2014, no pet.) (mem. op., not designated for publication). If identity is not or was not an issue, a trial court cannot order DNA testing. *Reger*, 222 S.W.3d at 514.

For retesting, "the convicted person must show that although previously subjected to DNA testing, the evidence can be subjected to testing with newer techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." *See Padilla v. State*, Nos. 03-12-00299—00301-CR, 2013 WL 3185896, at *5 (Tex. App.—Austin June 20, 2013, pet. ref'd) (mem. op., not designated for publication). "To meet this burden, the convicted person must provide statements of fact in support of his claims; general, conclusory statements are insufficient." *Id.*

In addition, the "convicted person" must establish "by a preponderance of the evidence that" he "would not have been convicted if exculpatory results had been obtained through DNA testing." Tex. Code Crim. Proc. art. 64.03(a)(2); *see also Dinkins v. State*, 84 S.W.3d 639, 643 (Tex. Crim. App. 2002) (explaining that "[a] trial court is never required to grant a convicted

11

person's request for testing absent" showing that "there is a reasonable probability that the person would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing"). In other words, the convicted person must show "that there is 'greater than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results.'" *Ex parte Gutierrez*, 337 S.W.3d 883, 899 (Tex. Crim. App. 2011) (quoting *Prible*, 245 S.W.3d at 467-68). "Texas courts have consistently held that a movant does not satisfy his burden under Article 64.03 if the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing." *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex. Crim. App. 2010).

When reviewing a trial court's decision regarding DNA testing, appellate courts "defer to the trial court's determination of historical facts, and its application of law to the facts if it turns on credibility and demeanor, and review de novo applications of law to the undisputed facts." *Caddie v. State*, 176 S.W.3d 286, 289 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). However, when the trial record and the convicted person's affidavit are the only sources of information supporting the motion, the trial court is in no better position than an appellate court in making the determination, and accordingly, appellate courts review the issues de novo. *See Smith v. State*, 165 S.W.3d 361, 363 (Tex. Crim. App. 2005); *see also Flores v. State*, 150 S.W.3d 750, 752 (Tex. App.—San Antonio 2004, no pet.) (explaining that "[t]he scope of evidence that an appellate court may review on appeal from the denial of a post-conviction motion for DNA testing is not limited to evidence relating to the motion and/or hearing on the motion for DNA testing").

## DISCUSSION

**DNA Testing**

In his first issue on appeal, Keller contends that the district court erred by denying his request for DNA testing because "exculpatory results would have supported his argument that someone else committed the murder." When presenting this issue on appeal, Keller notes that the murder weapon was never recovered, contends that identity was an issue during the trial because there were no witnesses to the murder and because the State had to use evidence of extraneous offenses in an attempt to link him to the murder of Wright, and then makes specific arguments regarding the items that he asserts should have been tested. We will address those items in the order briefed by Keller.

*Cigarette Butts*

Regarding the three cigarette butts collected from outside Wright's home, Keller contends that they might have been connected to the offense because "they could have been discarded by whoever shot Wright." Moreover, Keller highlights the arguments that he made during the trial and during the hearing on his motion for new trial suggesting that Hargett or someone else could have killed Wright. Further, Keller points to the various letters and statements that he referenced in his motion for new trial and attached to his motion requesting DNA testing in which the authors related that they either heard Hargett confess to killing Wright or that Hargett confessed to someone they knew that he killed someone.

In light of the preceding, Keller insists that if DNA testing performed on the cigarette butts excluded Wright and Keller, those results "would support [Keller's] claim that someone

13

else was there[] and shot Wright," particularly if the results matched DNA testing performed on other items taken from inside the home. Furthermore, Keller contends that these exculpatory results would have allowed the jury the option of concluding that "someone else was present" and deciding that the statements made by Keller indicating his guilt were not made in reference "to the murder of Wright."

As set out above, the district court determined that Keller did not establish by a preponderance of the evidence that he would not have been convicted if exculpatory results were obtained from testing the cigarette butts. During the trial, testimony was presented establishing that Wright regularly had visitors at his home, including Hargett; that Wright had a visitor just a few hours before the incident in question; and that Wright lived with his mom and stepfather. In light of the testimony establishing that several people regularly visited or lived at Wright's home and that the cigarette butts were found outside, if DNA testing performed on the cigarette butts had excluded Wright and Keller as DNA contributors, the results would not have necessarily exculpated Keller. *Cf. Skinner v. State*, 122 S.W.3d 808, 812 (Tex. Crim. App. 2003) (noting that testing requested "would only demonstrate the presence of a third party" and "not provide a reasonable probability of the appellant's innocence"); *see also Reed v. State*, 541 S.W.3d 759, 775 (Tex. Crim. App. 2017) (explaining that chapter 64 "does not require" courts "to presume an item's relevance").

In addition, testimony and other evidence at trial linked Keller to the crime at issue. Specifically, evidence showed that Keller was in possession of the weapon that was discharged inside Wright's home a few hours before Wright was shot, that Keller was driven to Wright's house shortly before Wright was killed, that Keller used Richardson's phone to communicate multiple

14

times with Wright before Wright died, that Keller was the last person to speak with Wright on the phone, that Keller went inside Wright's home, that Keller asked Fitch and Buckner to research Wright a few hours after Wright died to see if there were any news reports regarding Wright, that Keller told three jail guards that he killed a man in Belton, that Keller admitted to Fitch that he shot someone, that Keller admitted to Buckner that he killed Wright, that Keller asked Fitch to dispose of his cell phone, that Keller asked Fitch to tell Cameron to dispose of the gun that Cameron took from Keller, and that Keller responded, "Exactly," when Alexis confronted him about shooting and killing someone while he was with Richardson. Although the report affixed to his request for DNA testing regarding the cigarette butts indicated that they had been "recently smoked" and were found on the ground near Wright's body, Keller presented no evidence regarding any other potential links between those cigarette butts and the crime at issue.

Accordingly, we cannot conclude that the district court erred in deciding that Keller did not establish by a preponderance of the evidence that he would not have been convicted if DNA test results excluded Wright and Keller as contributors to the DNA profiles for the cigarette butts. Even assuming that any testing performed would show that Hargett was a contributor to the DNA profile, we would still be unable to conclude that the district court erred in light of the evidence summarized above and the evidence indicating that Hargett regularly visited the home. *Cf. Reed*, 541 S.W.3d at 774-75 (determining that movant had not met his burden of proving "by a preponderance of the evidence that . . . he would not have been convicted" if exculpatory DNA results were obtained because movant did not establish that items that he wanted tested were connected to charged crime and because movant failed "to explain why exculpatory results makes

15

his story at trial clearly more convincing than the State's 'story'"); *Prible*, 245 S.W.3d at 470 (noting that "without more, the presence of another person's DNA at the crime scene would not constitute affirmative evidence of the appellant's innocence"); *Bell v. State*, 90 S.W.3d 301, 304, 306 (Tex. Crim. App. 2002) (determining that if someone else's DNA were found on hair, cigarette butt, and blood-stained bath mat collected from crime scene, that would not constitute affirmative exculpatory evidence); *Luvano v. State*, 183 S.W.3d 918, 923 (Tex. App.—Eastland 2006, no pet.) (concluding that DNA testing would not have contradicted overwhelming evidence of guilt, including multiple confessions made by movant to police, "his mother," "to a television reporter," and "to his ex-girlfriend" because, "[a]t most, DNA testing might have proven that someone else was in the victim's apartment at some point in time" but "would not prove when the third person was in the apartment nor what he or she was doing while there").

*Blue Shirt*

When arguing that the district court erred by not ordering additional testing of the blue shirt found in Wright's bedroom, Keller notes that the testing that was performed revealed DNA from Wright and two other people and excluded Keller as a potential DNA contributor. Further, Keller points to his testimony in the hearing on his motion for new trial in which he asserted that he and Hargett struggled inside Wright's room and that Hargett was bleeding from injuries sustained during the fight. For these reasons, Keller contends that testing revealing the presence of Hargett's DNA on the blue shirt would exculpate Keller and indicate that someone else was the guilty party.

Additionally, although Keller notes that the shirt was already subjected to DNA testing, Keller points to the position statement from the Department of Public Safety regarding

DNA testing that he attached as an exhibit to his request for DNA testing indicating that there were errors in the population database used for testing evidence between 1999 and 2015. In light of this report, Keller argues that "there is the likelihood that more accurate results could be obtained if the result was re-interpreted."

At the outset, we note that there is a procedural hurdle to Keller's request to retest samples collected from the blue shirt. Chapter 64 does allow for requests to retest evidence that was previously subjected to DNA testing but *only* in circumstances where the evidence "can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." Tex. Code Crim. Proc. art. 64.01(b)(2). In his motion and on appeal, Keller does not identify what new testing techniques could be used that were not available when the tests were originally performed. Instead, Keller relies on the position statement indicating that there was the potential for error in results obtained during a specified time range and seems to suggest that a reevaluation of the statistical results already obtained from the prior testing should be conducted. In light of the nature of the position statement relied on by Keller and the relief Keller is requesting, it is not entirely clear that Keller could satisfy his burden of providing statements of fact supporting his claim that the evidence can be subjected to testing with *newer techniques*. *See Padilla*, 2013 WL 3185896, at *5; *see also Medearis v. State*, No. 03-12-00698-CR, 2013 WL 4822944, at *3 (Tex. App.—Austin Aug. 30, 2013, no pet.) (mem. op., not designated for publication) (noting that fact that samples had already been tested presents "procedural problem" to request for testing because chapter 64 applies to evidence that has not been previously tested or that can be subjected to new testing techniques providing more accurate and

17

probative results and because motion seeking testing acknowledged that testing had already occurred but did not "present any argument about newer testing techniques").

Assuming for the sake of argument that the type of information relied on by Keller can satisfy the statutory requirements and that the relief requested qualifies as testing by newer techniques, we note that the testing already performed on the shirt excluded Keller as a potential DNA contributor and that the position statement specified that "the effect on the statistics" from the possible errors in the population data "would be nominal and unlikely to have an impact on evidentiary samples," that "[t]he majority of the errors occurred in subpopulations that the Texas DPS system does not report," that "a change in statistics would not change a conclusion of included or excluded as that conclusion is made prior to statistics being calculated," and that changes to the testing model "are unlikely to materially affect the statistical estimates." Accordingly, Keller has not shown that a reevaluation of the testing performed on the blue shirt could produce results "that are more accurate *and* probative" than the previously obtained results. *See* Tex. Code Crim. Proc. art. 64.01(b)(2) (emphasis added).

Even assuming that Hargett or some other person were identified as a DNA contributor through further testing, that result would not demonstrate that Hargett or the other person was the person who committed the offense in question in light of the testimony establishing that Hargett and others regularly went to Wright's home. *See Walker v. State*, No. 14-03-01057-CR, 2004 WL 503331, at *2 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (mem. op., not designated for publication) (noting that evidence demonstrated that movant and his wife were in same room in which victim was murdered and that wife tried to revive victim and concluding that testing showing

18

presence or absence of victim's blood on wife's clothes would not prove movant's innocence); *see also Pegues v. State*, 518 S.W.3d 529, 535 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (noting that if physical evidence is collected from common area that could have been left by anyone, DNA test results excluding movant as DNA contributor would not also exclude movant as assailant).

This seems particularly true in this case where the record, as summarized above, contains substantial evidence of Keller's guilt that is independent of any DNA testing results. *See Swearingen*, 303 S.W.3d at 738 (overruling issue alleging that trial court erred by denying motion for DNA testing, in part, "[b]ecause of the overwhelming evidence of guilt independent of any potentially exculpatory DNA testing"); *Leal v. State*, 303 S.W.3d 292, 300-01 (Tex. Crim. App. 2009) (noting that even if additional testing excluded movant "as a contributor, it cannot be said that such a result 'establishes by a preponderance of the evidence that the person would not have been convicted'" (quoting Tex. Code Crim. Proc. art. 64.03(a)(2)(A))).

For all of these reasons, we cannot conclude that the district court erred by determining that Keller did not establish by a preponderance of the evidence that he would not have been convicted if additional testing of the shirt had been performed and produced exculpatory results.

*Black Shirt*

On appeal, Keller also argues that the district court erred by failing to order additional DNA testing on the black shirt found outside Wright's home. As support for this assertion, Keller relies on an exhibit attached to the State's response to his request for DNA testing. In the exhibit, a laboratory manager wrote a letter concerning the prior testing that had been done on the black shirt before trial, commented that the analyst had performed a presumptive screening on the shirt, noted

that there was no formal report regarding the presumptive testing done, stated that the analyst had retired, and commented that she would have required the analyst to "type the results in a supplemental report" if the analyst were still working for the lab. Based on these statements, Keller urges that the laboratory must have had concerns regarding the quality of the work done and that the district court should not have based its ruling on the unreliable results from prior testing. Accordingly, Keller insists that "he has established a reasonable likelihood that the black shirt contains biological material" and "that newer techniques would produce more accurate and/or probative results."

When presenting arguments regarding additional testing being performed on the black shirt, Keller faces the same procedural hurdle as with the blue shirt being subjected to more testing. *See* Tex. Code Crim. Proc. art. 64.01(b)(2). Moreover, Keller has not provided statements of fact supporting his claim that the evidence could be subjected to testing by newer techniques reasonably likely to provide more accurate and probative results. A "convicted person may not simply rely on general and conclusory statements." *Aekins v. State*, No. 03-16-00598-CR, 2017 WL 2333213, at *7 (Tex. App.—Austin May 25, 2017, pet. ref'd) (mem. op., not designated for publication).

Additionally, although the letter relied on by Keller notes the absence of a formal report regarding the prior presumptive testing performed, the letter also specified that the analyst's notes documented that the analyst obtained a negative result for the presumptive blood test performed on the shirt. In addition, the letter explained that the analyst performed more testing on the shirt after "swabb[ing] the neckline and underarm area of this item for DNA analysis." Moreover, the letter referenced the results of the DNA testing, and the analyst's report regarding the results was attached to the letter. In the report, the analyst explained that no "interpretable DNA

20

profile" from the swabs performed on the shirt was obtained.  Accordingly, we cannot conclude that the district court erred by determining that Keller had failed to establish a reasonable likelihood that the shirt contained DNA material suitable for additional testing.

Furthermore, substantial evidence of Keller's guilt was presented at trial that was independent of any DNA testing, and in light of that evidence, the district court could have reasonably concluded that Keller did not establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained from additional DNA testing performed on the black shirt.

For all of these reasons, we cannot conclude that the district court erred by failing to order that the black shirt be subjected to additional testing.

*Samples from the Front Door and Siding*

In his final set of arguments in his first issue, Keller asserts that the district court erred by failing to order testing to be performed on swabs taken from the front door, a cutout from the frame of the front door, scrapings collected from the front door, and siding from the front porch. When asserting that the district court erred, Keller acknowledges that a report regarding those items revealed that presumptive testing performed on them resulted in a negative finding for the presence of blood, but Keller argues chapter 64 allows for testing of several types of biological material, including "blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other biological evidence that may be suitable for forensic DNA testing."  Tex. Code Crim. Proc. art. 64.01(a)(1).  In light of the fact that chapter 64 applies to biological evidence beyond blood, Keller insists that a negative presumptive test for blood does not support a finding that the items

21

listed above should not be subjected to testing for other types of biological evidence. For these reasons, Keller urges that the district court erred when it concluded that he did not establish that there was a reasonable likelihood that the items contain biological material suitable for DNA testing.

Swabs and samples were taken from the items listed above as part of the investigation because those items were near where Wright's body was discovered, but Keller has not referred to any testimony or other evidence indicating that the murderer touched any of these items or that they were otherwise relevant to Wright's murder. Similarly, Keller has not referred to any testimony or other evidence potentially indicating that any biological material other than blood could have been deposited on those items during the commission of the crime, and the presumptive testing performed on those items indicated that there was no blood present. For these reasons, we cannot conclude that the district court erred by concluding that Keller did not establish that there is a reasonable likelihood that the items contained biological material suitable for DNA testing.

Additionally, as set out above, the district court would not have erred by denying the request for DNA testing on the ground that Keller did not establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through the testing of the items given the substantial evidence of Keller's guilt.

For all of these reasons, we overrule Keller's first issue on appeal.

**Appointment of Counsel**

In his second issue on appeal, Keller contends that the district court erred by failing to appoint him counsel as part of his request for DNA testing after the district court determined that there were no reasonable grounds for the motion for DNA testing "to be filed."

Under the Code of Criminal Procedure, a trial court is required to appoint counsel for a chapter 64 proceeding "if the person informs the court that the person wishes to submit a motion under this chapter, the court finds reasonable grounds for a motion to be filed, and the court determines that the person is indigent." Tex. Code Crim. Proc. art. 64.01(c); *see also Ex parte Gutierrez*, 337 S.W.3d at 889 (noting that "[a]n indigent convicted person intending to file a motion for post-conviction DNA testing . . . has a limited right to appointed counsel"). "[W]hether 'reasonable grounds' exist for testing necessarily turns on what is required for testing. Basic requirements are that biological evidence exists, that evidence is in a condition that it can be tested, that the identity of the perpetrator is or was an issue, and that this is the type of case in which exculpatory DNA results would make a difference." *Ex parte Gutierrez*, 337 S.W.3d at 891. In determining whether reasonable grounds exist, trial courts can "simply assume that the result of any proposed DNA testing is 'exculpatory' in the sense that the test will prove that the inmate is not the source of that DNA." *Id.* at 892. "[I]f that 'favorable' or 'exculpatory' finding would not change the probability that the inmate would still have been convicted, then there are no reasonable grounds to appoint an attorney and no justification for ordering any testing." *Id.* "A 'favorable' DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction." *Id.*

All of the incriminating evidence presented at trial supports the district court's ultimate conclusion that there were no reasonable grounds for the motion for DNA testing to be filed because exculpatory results from the requested testing would not change the probability that Keller would have been convicted. Accordingly, we cannot conclude that the district court erred by failing

23

to appoint an attorney for Keller for the purpose of pursuing relief under chapter 64. *Cf. id.* at 894 (determining that trial court did not err by concluding that no reasonable grounds for motion were present, in part, because "case was tried under the law of parties," because movant's statement placed him inside victim's "home with a screwdriver in his hand" and because statements from movant's accomplices placed them inside victim's home at time of murder and related that one of them stabbed victim).

For all of these reasons, we overrule Keller's second issue on appeal.

## CONCLUSION

Having overruled Keller's two issues on appeal, we affirm the district court's order denying Keller's request for DNA testing.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:   April 11, 2019

Do Not Publish

24