

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,089

**RUBEN GUTIERREZ, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM DENIAL OF MOTION FOR FORENSIC DNA TESTING IN CAUSE NO. 98-CR-00001391-A FROM THE 107TH JUDICIAL DISTRICT COURT CAMERON COUNTY

*Per curiam.*

### O P I N I O N

Appellant appeals from a trial court order denying his motion for post-conviction

DNA testing filed pursuant to Texas Code of Criminal Procedure Chapter 64.[1]  Appellant

---

[1]  References to Chapters or Articles are to the Texas Code of Criminal Procedure unless otherwise specified.  Appellant also filed a motion to stay his execution pending resolution of this appeal.  However, because we stayed appellant's execution in conjunction with appellant's pending motion for leave to file a petition for a writ of mandamus, this motion is moot and it is dismissed.  *See In re Ruben Gutierrez*, No. WR-59,552-03 (Tex. Crim. App. Oct. 22, 2019) (not

(continued...)

raises only two points of error but argues extensively about a third issue on which the court did not expressly rule. After reviewing all of the issues, we find appellant's points of error to be without merit. Consequently, we affirm the trial court's order denying testing.

I. *Background*

A. *Facts of the Case/Direct Appeal and Initial Habeas*

In our opinion affirming the trial court's denial of appellant's prior Chapter 64 motion for DNA testing, we summarized the facts of the case as follows:

> Appellant was convicted of capital murder and sentenced to death for his participation in the robbery and murder of eighty-five-year-old Escolastica Harrison. Mrs. Harrison lived with her nephew, Avel Cuellar, in a mobile-home park in Brownsville. She owned the mobile-home park, and her home doubled as the park's office. Mrs. Harrison did not trust banks, and, at the time of her murder, she had about $600,000 in cash hidden in her home. Appellant was one of the few people who knew about Mrs. Harrison's money. Mrs. Harrison had befriended appellant because he was friends with her nephew, Avel. Appellant sometimes ran errands for Mrs. Harrison, and he borrowed money from her. Appellant, Avel, and others routinely gathered behind Mrs. Harrison's home to drink and visit.
>
> Appellant, then 21 years old, orchestrated a plan to steal her money. On September 5, 1998, he and an accomplice, Rene Garcia–whom Mrs. Harrison did not know–entered Mrs. Harrison's home to carry out this plan. A third accomplice, Pedro Gracia, was the driver. When appellant and Rene Garcia left with Mrs. Harrison's money, she was dead. Avel Cuellar found her body late that night–face down in a pool of blood. She had been severely beaten and stabbed numerous times. Mrs. Harrison's bedroom was in disarray, and her money was missing.

---

[1](...continued)
designated for publication).

The next day, detectives canvassed the area for information. Detective Garcia, the lead investigator, already knew that appellant's drinking buddies–Avel Cuellar, Ramiro Martinez, and Crispin Villarreal–had all said that appellant was in the trailer park the evening of the murder. Another witness, Julio Lopez, also said appellant was there.[2]

On September 8, 1998, detectives went to appellant's home. He was not there, but his mother said she would bring him to the police station. The next day, appellant voluntarily came to the police station to make a statement. He gave an alibi. He said he had seen Avel Cuellar and another friend, Ramiro Martinez, at the trailer park on the Friday before the murder, but on the Saturday of the murder, he drove around with Joey Maldonaldo in Maldonaldo's Corvette all day long. They were nowhere near Mrs. Harrison's mobile-home park. When police asked him if he had his days mixed up, appellant cut off questioning. The alibi did not pan out. Joey Maldonaldo's statement did not mesh with appellant's.

Four days later, as a result of statements given by appellant's two accomplices, Rene Garcia and Pedro Gracia, and their own investigation, the police obtained an arrest warrant for appellant. He made a second statement. This time, he admitted that he had planned the "rip off," but said that he had waited at a park while Rene Garcia and Pedro Gracia did it. He said that when his two cohorts came to pick him up, Rene Garcia was holding a screwdriver covered in blood and said that he had killed Mrs. Harrison. Rene Garcia and Pedro Gracia had taken a blue suitcase and a tackle/tool box full of money. Appellant said, "There was no doubt about the fact that I planned the whole rip off but I never wanted for either one of them to kill Mrs. Harrison. When I saw that Pedro was grabbing the money from the tackle/tool box and heard some crumbling plastic I decided that I did not want any money that they had just ripped off." Appellant told the police that his accomplices had told him where they had thrown the blue suitcase away. Appellant led the detectives to a remote area, but when the officers could not find the blue suitcase, appellant was allowed out of the car, and he walked straight to it.

The next day appellant made a third statement, admitting that he had

---

[2] Mr. Lopez did not know appellant. The police showed him some "loose photos," and he picked out appellant in "a few seconds" and was "absolutely positive" about that identification. But by the time of trial, Mr. Lopez was not able to identify appellant in person.

lied in his previous one "about being dropped off in the park, about not being with Rene." He said Pedro Gracia drove the truck and dropped him and Rene Garcia off at Mrs. Harrison's home. The initial plan was for Rene Garcia to lure Mrs. Harrison out of her home by asking to see a trailer lot. Then appellant would come around from the back of her home, run in, and take the money without her seeing him. But when appellant ran around to the front, Rene Garcia and Mrs. Harrison were still inside the house. Appellant said Rene Garcia knocked out Mrs. Harrison by hitting her, and then he repeatedly stabbed her with a screwdriver. The screwdriver "had a clear handle with red, it was a standard screwdriver. We had got the screwdriver from the back of the truck in a tool box along with another screwdriver, a star type." Appellant gathered the money. "When he started stabbing her, I pulled out the blue suitcase from the closet and the black tool box fell. It opened when it fell and I saw the money." Appellant tossed the tool box to Rene Garcia, and headed out the door with the blue suitcase. Rene Garcia followed, and Pedro Gracia pulled the truck around to pick them up. Pedro Gracia dropped them off down a caliche road and appellant filled "up the little tool box with the money that was in the suitcase," while Rene Garcia filled up his shirt. They abandoned the suitcase, and Pedro Gracia picked them up and drove appellant home.

Much of the money was recovered. Appellant's wife's cousin, Juan Pablo Campos, led police to $50,000 that appellant had given him to keep safe. The prosecution's theory at trial was that appellant, either as a principal or as a party, intentionally murdered Mrs. Harrison during a robbery. The prosecution emphasized (1) the medical examiner's testimony that two different instruments caused the stab wounds,[3] (2) appellant's admission that he and Rene Garcia went inside Mrs. Harrison's home office with two different screwdrivers, and (3) the fact that four different people–Avel Cuellar, Ramiro Martinez, and Crispin Villarreal from "the drinking group" and another passerby, Mr. Lopez, who did not know appellant–all saw him at the mobile-home park the day that Mrs. Harrison was killed.

---

[3] The medical examiner testified that Mrs. Harrison suffered defensive wounds that indicated she had struggled for her life and tried to "ward off blows or attacks of some sort." He said that she was stabbed approximately thirteen times by two different instruments. One "almost certainly" was a flat-head screwdriver and the other was possibly a Phillips-head screwdriver.

The jury was instructed that it could convict appellant of capital murder if it found that appellant "acting alone or as a party" with the accomplice intentionally caused the victim's death. The jury returned a general verdict of guilt, and, based on the jury's findings at the punishment phase, the trial judge sentenced appellant to death.

*Ex parte Gutierrez*, 337 S.W.3d 883, 886-88 (Tex. Crim. App. 2011) (footnotes in original).

Appellant raised ten points of error on direct appeal, including challenges to the sufficiency of the evidence and the voluntariness of his statements. We affirmed appellant's conviction and sentence. *Gutierrez v. State*, No. AP-73,462 (Tex. Crim. App. Jan. 16, 2002) (not designated for publication). In his initial state habeas application, appellant raised twenty allegations, including challenges to the voluntariness of his statements. This Court denied appellant relief. *Ex parte Gutierrez*, No. WR-59,552-01 (Tex. Crim. App. May 14, 2008) (not designated for publication).

B. *Prior Chapter 64 DNA Appeal and Subsequent Habeas Proceeding*

In April 2010, appellant filed in the trial court a Chapter 64 motion for DNA testing. In the motion, appellant acknowledged that three men were involved in the Harrison robbery: himself, Rene Garcia, and Pedro Gracia. Relying on evidence that only two people entered the home, appellant argued that exculpatory DNA test results would show that he would not have been convicted of capital murder or sentenced to death. Although appellant did not specifically state in his motion which items he wanted tested, his discussion of the evidence indicates that he sought DNA testing of:

- a blood sample taken from the victim;

- a shirt belonging to the victim's nephew and housemate, Cuellar, containing apparent blood stains;

- nail scrapings taken from the victim during the autopsy;

- blood samples collected from Cuellar's bathroom, from a raincoat located in or just outside his bedroom, and from the sofa in the front room of the victim's house; and

- a single loose hair found around the third digit of the victim's left hand during the autopsy.

Appellant accompanied his request for testing with a statement in which he asserted that the identity of Harrison's killer was an issue at trial and continues to be an issue. He also asserted that testing excluding him as a contributor of the biological material would have changed the trial's outcome. In other words, appellant essentially asserted that exculpatory results would have supported his position that he neither murdered Harrison nor anticipated her murder. The trial judge denied the request, finding that:

- appellant had the opportunity to have the evidence tested before trial, but did not avail himself of that opportunity;

- the single loose hair "does not exist because it was never recovered as evidence in the investigation of the case";

- the defendant failed to show that identity was an issue in the case considering his own statements, the statements of the co-defendants, and the statement of an eyewitness who connected him to the murder scene; and

- the defendant failed to establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained

through DNA testing.[4]

This Court affirmed the trial court's denial of testing. *See Gutierrez*, 337 S.W.3d 883.

Immediately after this Court affirmed the trial court's denial of appellant's motion for Chapter 64 DNA testing, appellant filed in the trial court a subsequent writ of habeas corpus application. In one of the claims raised in that application, appellant asserted that the State failed to disclose material and exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, appellant asserted that the State should have submitted certain biological evidence for DNA testing. This Court dismissed the application because it failed to meet the Article 11.071, section 5, requirements for a subsequent writ application. *Ex parte Gutierrez*, No. WR-59,552-02 (Tex. Crim. App. Aug. 24, 2011) (not designated for publication).

In November 2015, appellant filed in the trial court a "Motion for Miscellaneous Relief." In the motion, appellant sought a court order declaring that he had

> a constitutional due process right under *Brady v. Maryland*, . . ., to conduct independent DNA tests on potentially exculpatory biological evidence in [the State's] custody or control and that [the State] . . . be ordered to release the evidence to Defendant under a reasonable protocol regarding chain of custody and preservation of the evidence, in order that Defendant can have the evidence tested at his own expense.

Appellant requested access for DNA testing to the same items that he had previously requested in his Chapter 64 motion. The State did not oppose the request for testing, but neither did the State agree to the relief requested. The trial court ultimately denied the

---

[4] *See* Arts. 64.01 and 64.03 (2010).

motion in April 2018.  Slightly more than a year later, appellant filed his second Chapter

64 motion for post-conviction DNA testing, which is the subject of this appeal.

## II. *Chapter 64 and the Standard of Review*

As we stated in our opinion on appellant's prior Chapter 64 appeal, "There is no

free-standing due-process right to DNA testing, and the task of fashioning rules to

'harness DNA's power to prove innocence without unnecessarily overthrowing the

established system of criminal justice' belongs 'primarily to the legislature.'"  *Gutierrez*,

337 S.W.3d at 889 (quoting *District Attorney's Office v. Osborne*, 557 U.S. 52, 62

(2009)); *see also Ex parte Mines*, 26 S.W.3d 910, 914 (Tex. Crim. App. 2000) (stating

that there is no constitutional right to post-conviction DNA testing).  The Texas

Legislature created a process for such testing in Chapter 64.

Under Chapter 64, the convicting court must order DNA testing only if the court

finds that:

1.  the evidence "still exists and is in a condition making DNA testing possible;"

2.  the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;"

3.  "there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing; and"

4.  "identity was or is an issue in the case[.]"

Art. 64.03(a)(1).  Additionally, the convicted person must establish by a preponderance of

the evidence that:

1. he "would not have been convicted if exculpatory results had been obtained through DNA testing; and"

2. "the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice."

Art. 64.03(a)(2).

In reviewing a judge's ruling on a Chapter 64 motion, this Court gives almost total deference to the judge's resolution of historical fact issues supported by the record and applications-of-law-to-fact issues turning on witness credibility and demeanor. *Reed v. State*, 541 S.W.3d 759, 768 (Tex. Crim. App. 2017). But we consider *de novo* all other application-of-law-to-fact questions. *Id*. at 768-69.

III. *The Current Chapter 64 Motion and the Trial Court's Ruling*

In June 2019, appellant filed in the trial court his second Chapter 64 motion for DNA testing. In the motion, he requested testing of:

• fingernail scrapings collected from the victim;

• the victim's nightgown, robe, and slip;[5]

• a hair found in the victim's hand;

• blood samples collected from the victim's bathroom, from a raincoat located in Cuellar's bedroom, and from the sofa in the victim's living room; and

---

[5] In the first paragraph of his motion, appellant requests testing of the victim's nightgown, robe, and slip. However, in the conclusion paragraph, appellant requests testing of the victim's nightgown, robe, slip, *and socks*. For purposes of our analysis, this discrepancy makes no difference.

• clothing collected from Cuellar.

Appellant accompanied his request with an affidavit. Therein, he asserted that the identity of Harrison's killer was an issue at trial and that, had the jury learned of a third party profile on the items collected as evidence, it would not have convicted him or sentenced him to death.

The trial judge denied the request in a written order stating in pertinent part:

On review of the pleadings, evidence, and arguments, the court finds that Movant has not shown by a preponderance of the evidence that a reasonable probability exists that defendant would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing.

The court further finds by a preponderance of the evidence that Movant's request for the proposed DNA testing is made for the purpose of unreasonably delaying the execution of sentence or administration of justice.

The court made no other explicit findings of fact or conclusions of law.

IV. *Appellant's Arguments on Appeal and the Court's Analysis*

The two points of error appellant raises on appeal specifically concern the Article 64.03(a)(2) requirements, and neither implicates the Article 64.03(a)(1) requirements. However, a substantial portion of appellant's brief and of his reply brief discuss a third issue: the (a)(1) identity requirement. We will review all of the Article 64.03(a) requirements.

A. *Article 64.03(a)(1) Requirements*

In his motion for DNA testing, appellant asserted that the items he sought to have

tested contained biological material, were in a condition making DNA testing possible, and had an intact chain of custody.[6]  *See* Art. 64.03(a)(1)(A) and (B).  The State did not contest these assertions.  The trial court did not make express findings that these requirements of Article 64.03(a)(1) had been met, but we will assume in the absence of argument or evidence to the contrary that they have been.

Appellant also asserted in his motion that identity was an issue in this case.  *See* Art. 64.03(a)(1)(C).  He conceded that this Court found in its opinion on his prior DNA appeal that identity was not an issue in this case.  However, he argued that new evidence requires the Court to re-evaluate this holding.  Specifically, appellant asserted that new evidence:  casts doubt on a witness's identification of him at the crime scene; shows that the lead detective testified falsely in the case; and shows that his third statement was not voluntarily given.  Further, appellant asserted that compelling evidence points to the victim's nephew, Cuellar, as the actual killer.  The State contested appellant's assertions on the identity issue.  Again, the trial court did not make an express finding regarding this requirement of Article 64.03(a)(1).

Appellant raises the same arguments on appeal, and the State continues to contest appellant's assertions that identity is an issue.  However, we need not determine whether

---

[6]  In his 2010 motion for DNA testing, appellant requested testing of "a single loose hair found around the third digit of the victim's left hand that was recovered during the autopsy."  The State could not locate the hair, and the trial court determined that the loose hair was not collected as evidence.  *See Gutierrez*, 337 S.W.3d at 897-98.  Appellant's counsel represent that they have located the hair with the other evidence in the case, and appellant again requests testing of this hair.

identity is an issue in this case because appellant has failed to establish that he would not have been convicted if exculpatory results had been obtained through DNA testing. *See Wilson v. State*, 185 S.W.3d 481, 485 (Tex. Crim. App. 2006) (stating that, even if DNA testing showed that an additional perpetrator was involved, it would have "no effect whatsoever" on the appellant's conviction as a party).

B. *Article 64.03(a)(2) Requirements*

In his first express point of error on appeal, appellant asserts that "the district court wrongly concluded that [he] failed to prove that exculpatory DNA test results would likely have resulted in his acquittal[.]" In the second, he asserts that "the district court wrongly concluded that [his] request for DNA testing was intended to unreasonably delay the execution of sentence or the administration of justice[.]"

1. *Whether the district court wrongly concluded that appellant failed to establish that he would not have been convicted if exculpatory results had been obtained through DNA testing*

According to the evidence presented, the eighty-five-year-old Harrison lived with her nephew (Cuellar) in a trailer park that she owned. She did not trust banks, so she kept large sums of cash in her home/office, a fact that appellant knew. Harrison was killed in her home by what appeared to be two different weapons. She also suffered bruising and contusions. Four people had seen appellant in the trailer park on the day Harrison was killed. Three of those witnesses knew appellant.

Although the police initially suspected Cuellar, their investigation led them to

appellant.  When questioned, appellant originally told the police that he was driving around with a friend on the day of the offense, but the friend did not corroborate appellant's account.  During their investigation, the police obtained statements from appellant's accomplice Garcia.[7]  In the last of three statements he gave the police, Garcia stated that appellant planned "the whole rip off."  He said that he (Garcia) entered the home office to talk to Harrison about renting a lot.  Garcia said he was then supposed to hit Harrison, but he could not do it.  He stated that appellant, who had subsequently entered the home, hit Harrison and dragged her into another room.  When she started waking up, appellant stabbed her with a screwdriver.

Accomplice Gracia also gave a statement to the police.  Gracia explained that appellant showed him a house appellant intended to burglarize.  Appellant then pressured Gracia until he agreed to pick up appellant and another person after they finished the job.  Gracia stated that, soon after the burglary, he heard that the woman who owned the trailer park had been killed.

As a result of these statements and their own further investigation, the police arrested appellant.  At this time, appellant gave a statement in which he admitted that he planned "the whole rip off," but he stated that he stayed at a park while Garcia and Gracia committed the offense.  He also stated that he never wanted them to kill the victim.  In a

---

[7] As established in appellant's prior DNA appeal, statements from Garcia and Gracia are properly considered in a Chapter 64 motion for DNA testing analysis.  *Gutierrez*, 337 S.W.3d at 892.

second statement, appellant repeated what he had said earlier, but added details about Cuellar. Appellant said that: Cuellar had stolen from Harrison a couple of months earlier, he was mean to her, she was going to kick him out, and he shot up heroin and smoked marijuana. Finally, in a third statement, appellant admitted that he lied in his earlier statements about not being in the house. He further admitted that he had been in Harrison's house during the offense and that he had found the money. But he stated that Garcia stabbed the victim multiple times. He also noted that Cuellar told him to "rip . . . off" Harrison. Appellant later led the police to a remote area where he and his accomplices had thrown the suitcase that had contained money stolen from the house. Finally, sometime after the crime, appellant's wife's cousin led police to $50,000 that appellant had given him to keep safe.

Appellant now asserts that he should be allowed to DNA test the several items previously listed because exculpatory results will show by a preponderance of the evidence that he never would have been convicted. Appellant cannot make this showing. In appellant's prior DNA appeal, during the discussion of whether identity was an issue, we recognized that this case was tried under the law of parties. We found that the combination of the following was highly probative of whether identity was, in fact, an issue: (1) appellant's third statement, placing him inside Harrison's home with a screwdriver; (2) Garcia's statement placing appellant inside Harrison's home and stabbing her; and (3) Gracia's statement placing appellant inside Harrison's home at the

time of the murder.  *Gutierrez*, 337 S.W.3d at 894-95.

Here, as in the 2010 DNA appeal, these three consistent statements unequivocally place appellant inside Harrison's home at the time of her murder.  As they were probative of the identity issue in the prior appeal, these statements are also highly probative here.  Specifically, they are highly probative of whether appellant can meet his burden to show that he would not have been convicted should DNA testing reveal exculpatory results.[8]  *See id*. at 899.  Appellant admitted planning "the whole rip off," showing his involvement as a party.  In cases involving accomplices, a defendant can only meet his burden under Article 64.03(a)(2)(A) if he can show that the testing, if exculpatory, will establish that he did not commit the crime as either a principal or a party.  *Id*. at 900; *see also Wilson*, 185 S.W.3d at 485.  We now turn to each of the items requested.

a.        *Fingernail scrapings collected from the victim*

Appellant asserts that, since the victim fought her attacker, DNA under her fingernails will show the killer's identity.  We disagree.  First, even though the medical examiner opined that the victim had "defensive wounds," there is no evidence in the record to suggest that the five-foot-four-inch, 105-pound, 85-year-old Harrison was able

---

[8]  As previously noted, appellant asserts that his third statement was not voluntarily given.  He asserts that new evidence confirms this.  We disagree.  Appellant challenged the voluntariness of his third statement in a pretrial motion to suppress, on appeal, and in his initial state habeas application.  *See Gutierrez* at 892 n.23.  Both the trial court and this Court found the statement to be voluntary.  Appellant now presents "new evidence" allegedly showing that the police coerced and mistreated two other witnesses in this case.  Therefore, he postulates that the police also coerced him.  Appellant's argument does not overcome the prior court holdings.

to hit or scratch her murderers as they attacked and stabbed her thirteen times in the face and neck. Second, even if DNA were found in the fingernail scrapings, it could just as easily have come from an accomplice. Notably, in his own statement, appellant accused Garcia of actually killing Harrison. Therefore, appellant's DNA might well not be present in the fingernail scrapings. Such a finding would not relieve him of liability as a party in the case.

Further, even if testing revealed the presence of DNA belonging to someone other than Garcia or appellant, it would not negate appellant's own admission in his statements that he planned "the whole rip off." Appellant asserts that a DNA profile tying Cuellar to the crime "would be especially likely to have changed the outcome of the trial." But one would expect to find Cuellar's DNA among the samples collected from the scene. Cuellar lived in the home and he found Harrison's body. Finding Cuellar's DNA in the fingernail scrapings would not negate appellant's own admissions or other evidence placing appellant at the scene of the crime. Given the evidence, appellant simply cannot show a greater than 50% chance that a jury would not convict him if DNA results excluded him as a contributor of any material under Harrison's fingernails since appellant expressly admitted to planning "the whole rip off" and could have been convicted as a party. *See* Art. 64.03(a)(2).

b.    *The victim's nightgown, robe, and slip*

Appellant asserts that touch-DNA from the victim's nightgown, robe, and slip

could show the murderer's identity. Again, appellant simply cannot show a greater than 50% chance that a jury would not convict him if DNA results excluded him as a contributor of any material. By appellant's own statement, Garcia killed Harrison, not him. Therefore, one would expect not to find appellant's DNA on these items. That result would not release appellant from party liability for the offense.

Appellant again asserts that finding Cuellar's DNA on the victim's clothing would show that Cuellar was the murderer. However, just as the murderer could have transferred DNA to the victim, so could have Cuellar when he found the body or just by sharing the same house. This possibility would not make a different trial outcome likely.

c.    *A hair found in the victim's hand*

Even if the hair found in Harrison's hand belonged to her attacker, appellant cannot show by a preponderance of the evidence that the result of the trial would have been different if DNA results exculpated him as the contributor of the hair. By appellant's own statement, Garcia killed Harrison, not him. Therefore, one would not expect to find appellant's DNA on this item. An exculpatory result would not release appellant from party liability for the offense.

d.    *Blood samples collected from the victim's bathroom, from a raincoat located in Cuellar's bedroom, and from the sofa in the victim's living room*

Again, by appellant's own statement, Garcia killed Harrison, not him. Further, appellant admitted involvement and Cuellar discovered Harrison's body. Regardless of

whose DNA, if any, is found in these samples, no result would release appellant from party liability for the offense.

e.     *Clothing collected from Cuellar*

From the facts presented, blood on Cuellar's clothing is likely to be the victim's. Cuellar lived with the victim and he found her body.  Appellant speculates that Cuellar is actually the killer.  He postulates that a "blood stain . . . pattern interpretation" of Cuellar's clothes would show that the blood on his clothing was actually cast off from Cuellar killing Harrison and not transfer that would be expected when a person picks up a bloody victim.  But blood stain pattern interpretation is not accomplished through DNA testing.  Therefore, this argument is not properly part of a Chapter 64 motion or analysis.

Under the circumstances, appellant has not established by a preponderance of the evidence that he would not have been convicted if exculpatory results were obtained through DNA testing.  Thus, he has not met the requirements of Article 64.03(a)(2) and the trial court properly denied him testing.

f.     *General due process argument*

Finally, appellant argues in this point of error that, by limiting Chapter 64 to innocence (a finding that he would not have been convicted), he was denied his due process rights.  Appellant raised a similar argument in his previous DNA appeal.  In that opinion, we stated:

> Chapter 64 deals only with testing evidence that could establish, by a
> preponderance of the evidence, that the person "would not have been

*convicted* if exculpatory results" were obtained. The statute does not authorize testing when exculpatory testing results might affect only the punishment or sentence that he received. In this case, even supposing that a DNA test result showed Gracia's DNA in the fingernail scrapings taken from Mrs. Harrison, this evidence would, at best, show only that Gracia, rather than appellant, was the second stabber in the house. It would not establish that appellant, who admittedly masterminded "the rip-off," was not a party to Mrs. Harrison's murder. And, even if Chapter 64 did apply to evidence that might affect the punishment stage as well as conviction, appellant still would not be entitled to testing. Appellant would still have been death-eligible because the record facts satisfy the *Enmund/Tison*[9] culpability requirements that he played a major role in the underlying robbery and that his acts showed a reckless indifference to human life.

*Gutierrez*, 337 S.W.3d at 901 (footnotes omitted). The reasoning in that appeal continues

to apply here. Appellant's first point of error is overruled.

> 2. *Whether the district court wrongly concluded that appellant failed to establish that the request for the proposed DNA testing was not made to unreasonably delay the execution of sentence or administration of justice*

Because appellant has not met the requirements of Article 64.03(a)(2)(A), he is not

entitled to DNA testing under Chapter 64. Thus, even if we resolved this claim in his

favor, he would not receive relief. Therefore, we need not determine whether the trial

court properly found that appellant also failed to establish by a preponderance of the

evidence that his request for DNA testing was not made to unreasonably delay the

execution of sentence or the administration of justice. Appellant's second point of error

---

[9] *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987) (Eighth Amendment does not prohibit death penalty as disproportionate in case of defendant whose participation in felony that results in murder is major and whose mental state is one of reckless indifference).

is moot.

Having determined that appellant failed to meet his burden under the statute, we affirm the convicting court's order denying the motion for forensic DNA testing pursuant to Texas Code Criminal Procedure Chapter 64.

Delivered:     February 26, 2020
Do Not Publish